734 So.2d 327 (1999)
John W. DILLING, Appellant
v.
Denise L. DILLING, Appellee.
No. 97-CA-00037 COA.
Court of Appeals of Mississippi.
February 23, 1999.
*329 Mark V. Knighten, Pascagoula, Attorney for Appellant.
G. Charles Bordis IV, Ocean Springs, Attorney for Appellee.
EN BANC:
COLEMAN, J., for the Court:
¶ 1. The appellant, John W. Dilling, appeals from the judgment of the Jackson County Chancery Court which incarcerated him for five days in the Jackson County Jail for contempt of court and from that court's supplemental judgment which required Mr. Dilling to pay the mortgage payments on the Dillings' former marital home instead of the appellee, Denise L. Dilling, as the court had originally ordered in the judgment of divorce. In his appeal from the judgment of contempt and the supplemental judgment, Mr. Dilling presents for our review and resolution two issues, which we quote verbatim from his brief:
1. WHETHER THE LOWER COURT ERRED IN AMENDING/MODIFYING THE PROPERTY SETTLEMENT AGREEMENT SIGNED BY THE PARTIES.
2. WHETHER THE LOWER COURT ERRED IN FINDING THE APPELLANT IN CRIMINAL CONTEMPT OF COURT NECESSITATING THE IMPOSITION OF INCARCERATION.
¶ 2. Although she filed no cross-appeal, Ms. Dilling restates the issues as follows:
1. THE LOWER COURT PROPERLY MODIFIED/AMENDED THE PROPERTY SETTLEMENT AGREEMENT SIGNED BY THE PARTIES TO REFLECT THAT HUSBAND WAS TO PAY ALL HOUSE NOTES ON THE MARITAL HOME IN ACCORDANCE WITH MISSISSIPPI RULES OF CIVIL PROCEDURE 60.
2. THE LOWER COURT PROPERLY REFORMED THE PROPERTY SETTLEMENT AGREEMENT EXECUTED BY THE PARTIES.
3. THE CONDUCT OF THE APPELLANT WAS WILFUL AND CONTEMPTUOUS AND THE LOWER COURT WAS AUTHORIZED TO INCARCERATE THE APPELLANT FOR HIS FAILURE TO ABIDE BY THE TERMS OF THE COURT ORDER.
However, we affirm.

I. FACTS
¶ 3. John W. Dilling and Denise L. Dilling were married on February 4, 1989 and continued to live as husband and wife until January 26, 1996. One child, Leigh Ann Dilling, a daughter, was born to the Dillings' marriage on September 24, 1990. The Dillings executed a "Child Support, Custody and Property Settlement Agreement" on March 29, 1996, a copy of which they filed with their joint complaint for divorce on April 8, 1996. Through their complaint, the parties requested a divorce on the grounds of irreconcilable differences pursuant to Section 93-5-2 of the Mississippi Code (Rev.1994). On June 11, 1996, the chancery court rendered and entered its "judgment for divorceirreconcilable differences" (judgment for divorce). In the judgment for divorce, the chancery court granted the Dillings a divorce on the grounds of irreconcilable differences and "ratified and approved" their agreement, which the court incorporated into and made a part of the judgment so that "the terms therein contained [were] as much a part [of the judgment for divorce] as if copied in full herein...." The Dillings' agreement was drafted by Denise Dilling's attorney, who had divided the agreement into three sections delineated as "John W. Dilling Agrees as Follows," "Denise L. Dilling Agrees as Follows," and "Both Parties Agree as Follows." Denise Dilling agreed that she claimed no interest either in receiving alimony from her husband or in Mr. Dilling's retirement. She also agreed that Mr. Dilling would have sole *330 ownership of the Jeep and the Volkswagen automobile.
¶ 4. Regarding their daughter's custody and visitation, the Dillings agreed to the following restriction:
3. That the parties shall have no one of the opposite sex spend the night that they are not married to, while the minor is in their custody.
The agreement also contained the following proviso:
4. It is understood that Barbara E. Harvey represents solely Denise L. Dilling and that John L. Dilling has been advised to seek counsel to protect his rights if he so desires.
Mr. Dilling sought no representation until after the chancery court entered the judgment of divorce and Ms. Dilling filed her complaint to hold Mr. Dilling in contempt.
¶ 5. For his part, John Dilling specifically agreed that Ms. Dilling would have custody of the minor child and that he would pay child support in the amount of $90 per week along with all medical, dental, and eye care expenses for the child. He agreed (1) that Ms. Dilling would have sole ownership of most of the furnishings in the marital home and of a 1988 Pontiac "Grand Am" automobile; (2) that he would repair the roof of the marital home before June, 1996; (3) that he would pay Ms. Dilling's attorney's fees, without the amount's being specified, and costs of court for the divorce no later than June 1996; (4) that he would maintain a life insurance policy in the amount of $30,000 with the Dillings' daughter listed as the beneficiary of the policy; and (5) that he would pay a debt owed to Singing River Hospital incurred for Ms. Dilling's care. The following paragraph, which we quote, was listed under John Dilling's covenants:
2. That the wife shall have exclusive use and possession of the marital home located at 4817 Fordham Drive, Gautier, Mississippi and shall pay all house notes which includes taxes and insurance thereon. That the wife shall have the right to live there for as long as she does not remarry. In the event that the wife remarries or the wife decides to move from said home then the parties shall sell said home and the husband shall receive Sixty Five (65%) of the proceeds from said sale with the wife receiving Thirty Five (35%) of said proceeds.

II. LITIGATION
¶ 6. On August 14, 1996, Denise Dilling filed her "Complaint for Contempt, Modification, and for Other Relief" in which she asserted that John Dilling had "willfully, obstinately and contumaciously violated the terms of said agreement and Court order" by violating the provision proscribing overnight visitation with the minor child in the presence of a member of the opposite sex. Ms. Dilling's complaint also included this paragraph:
Plaintiff [Ms. Dilling] would further show that the parties agreed that Defendant would be responsible for the payment of all house notes; however, the language of the Property Settlement Agreement is unclear as to the same and should be amended so as to reflect the intent of the parties.
Ms. Dilling continued that she was "financially incapable of satisfying the house notes, while [Mr. Dilling was] fully capable of the same." She advised the court that the monthly payments were three months in arrears and that "foreclosure proceedings will soon commence." Finally, Ms. Dilling requested reasonable attorney's fees incurred in seeking enforcement of the court's judgment.
¶ 7. Mr. Dilling filed his answer to Ms. Dilling's complaint on October 16, 1996. Still later on October 29, Ms. Dilling filed a "Motion to Correct Judgment pursuant to Rule 60 of the Mississippi Rules of Civil Procedure." In that motion, she again suggested that the agreement and the resulting judgment inaccurately reflected the intent of the parties because of a "scrivener's error", and she asked the court to *331 correct the judgment and require Mr. Dilling to satisfy the house notes.

III. HEARING
¶ 8. At the hearing which the chancellor conducted on Ms. Dilling's complaint for contempt and Rule 60(b) motion, Ms. Dilling's first witness was Barbara E. Harvey, the lawyer who had represented her as the Dillings obtained a divorce. Ms. Harvey had drafted the property settlement agreement and had acknowledged the Dillings' having signed the agreement. Ms. Harvey recalled the dispute about who would pay the monthly mortgage payments on their home as follows:
Q. Was the first draft ever presented to him?
A. My best recollection was that Ms. Dilling picked up the first property settlement and brought it to him. Now, I could be wrong, but that's what I remember. And it was related to me that he refused to sign that, because he didn't want to have to pay the house note. Then I believe they got together and rehashed it again, and it [sic] came up with giving him more equity, which satisfied it.
Ms. Harvey reviewed the paragraph which stated that Ms. Dilling would "pay all house notes which include[d] taxes and insurance thereon," and then testified that it did not accurately reflect the agreement that the Dillings had reached because Mr. Dilling was supposed to pay the house note. She acknowledged that the language "flows like [Ms. Dilling]'s to [pay] it," but she explained that it became necessary to increase Mr. Dilling's equity in the house to 65% before he would promise to pay the monthly payments on the mortgage, taxes, and insurance premiums on their house.
¶ 9. Ms. Harvey testified that "when we redrafted, we made the mistake" in not clearly stating that Mr. Dilling would be responsible for paying the house note. Ms. Harvey directed the chancellor's attention to the point where she believed that a computer error resulted in the omission of the word "husband" in the agreement, and she submitted that the omission was the only mistake that she noticed in the agreement.
¶ 10. On cross-examination, Ms. Harvey conceded that the sentence of the agreement in question, as written, was understandable and that it required Ms. Dilling to pay the house note, along with taxes and insurance. Ms. Harvey also acknowledged that her theory that the term in question resulted from a computer error was pure speculation. She affirmed that Mr. Dilling was not represented by an attorney in the divorce and that she personally prepared the agreement. Ms. Harvey testified that she explained the agreement to Ms. Dilling, who read and signed it, and she stated that Mr. Dilling also read the document and signed it. Ms. Harvey explained to the court that she did not have a copy of the first draft of the agreement with her and that it had probably been destroyed. Finally, she testified that she discussed Mr. Dilling's duty to pay the house note with Mr. Dilling when he came to her office to sign the final draft. Mr. Dilling would later testify that Ms. Harvey was not in her office when he went there to sign the agreement.
¶ 11. Mr. Dilling was Ms. Dilling's second witness. About his alleged violation of the overnight visitation provision, Dilling testified that he moved in and shared expenses with his girlfriend after he and Ms. Dilling were divorced. He confirmed that he was living with his girlfriend at the time of the hearing. He admitted that he was aware that the agreement prohibited him from having members of the opposite sex stay overnight when his child visited him, and he first testified that his girlfriend had never spent the night with him while his daughter was visiting. However, Mr. Dilling later confirmed that his daughter, his girlfriend, and his girlfriend's son, and he spent the night together in a tent while on a camping trip to Mountain View, Arkansas *332 including July, 4, 1996, which lasted for several days. He insisted that he and his girlfriend did not engage in sexual relations or other immoral conduct in the presence of the minor child or anyone else during their camping trip in Arkansas.
¶ 12. As to the execution of the property settlement agreement, Mr. Dilling stated that he went to Ms. Harvey's office, read the agreement, and signed it. He said that he did not see Ms. Harvey or Ms. Dilling and that the agreement was not notarized when he signed it. Mr. Dilling contended that he would never have signed that agreement if it had stated that he was required to pay the house note. Finally, Mr. Dilling detailed the terms of the property settlement agreement regarding personal property.
¶ 13. Although Mr. Dilling said that he was the primary breadwinner for the family and that Ms. Dilling just worked "odd-and-end jobs here and there" during the marriage, he recollected that Ms. Dilling was employed at a nursery and at Wal-Mart for approximately minimum wage at the time they executed the property settlement agreement. He noted that Ms. Dilling maintained the home and took care of the minor child during their marriage and that he earned the money that was used to pay all of the bills during the entire seven-year marriage. Mr. Dilling later testified that both he and Ms. Dilling deposited their paychecks into the same account during the marriage and that Ms. Dilling paid their bills from the joint account. Mr. Dilling agreed that his income totaled $34,495 for the year, as reflected by the W-2 statements in evidence. He estimated the amount of the bills that he was paying at the time of the divorce, and he acknowledged that the discussions about who would pay the house note were a point of contention in the agreement. Mr. Dilling said that he understood that Ms. Dilling waived all rights to his retirement and to alimony, but he indicated that he had very little retirement money and that he thought that the child support was alimony. He said that Ms. Dilling had confronted him about paying the house note since the divorce, but he believed that the house note was not his responsibility under the agreement. Mr. Dilling contended that he only agreed to pay the house note until the divorce was final, which he had done. Mr. Dilling asserted that he did not know why he was supposed to get nearly twice the equity in the home if it were sold and that he did not remember discussing that provision with Ms. Dilling. He recognized that he agreed to pay Ms. Harvey's attorney's fees and a hospital bill in the amount of approximately $5,000, but he explained that he was experiencing money problems and had not paid the $130 monthly hospital payment for a couple of months.
¶ 14. Finally, Denise Dilling testified. Ms. Dilling stated that the house required extensive repair at the time that she and Mr. Dilling separated. When questions arose regarding the agreement reached by the parties, Mr. Dilling raised an objection based upon the Best Evidence Rule and the Parol Evidence Rule, suggesting that the language in the agreement was unambiguous and that evidence of parol agreements should be prohibited. Ms. Dilling established that the monthly mortgage payment was $280, that the Dillings still owed a balance of approximately $25,000 on their debt secured by their home, and that according to the recent county reassessment, the value of their home was $47,000. She affirmed that Mr. Dilling refused to sign the initial agreement which required him to pay the house note but relented only after Ms. Harvey modified the terms of the agreement to give Mr. Dilling 65% of the equity in their home after it had been sold. She revealed that the house note was two months in arrears and that her parents had loaned her money to pay three monthly installments of the debt plus late fees to keep the house out of foreclosure until the hearing. She said that foreclosure had been threatened twice and that she raised $250 for the house note by selling an automobile engine that Dilling *333 had left at the house after their separation.
¶ 15. Ms. Dilling disclosed that she worked the night shift at Wal-Mart in Pascagoula, on duty 32 to 38 hours per week for $5.70 per hour. She affirmed that her take-home income was $656.60 per month and that she received no food stamps, AFDC, or other public assistance. Thus, her only income came from her Wal-Mart wages and Mr. Dilling's payment of child support. She testified that her monthly expenses totaled $1,562.45, and she explained that she had been unable to pay the $280 house note and that she would not be able to pay it any time soon. Ms. Dilling advanced her request for attorney's fees by explaining that she would not have incurred the expense if Mr. Dilling had complied with the court order. She then entered into evidence the bill for her attorney's fees.
¶ 16. On cross-examination, Ms. Dilling explained that she could not leave the marital home because she had no other place to live. She noted that child care required $50 per week of the $90 per week she received for child support. Ms. Dilling said that she read the agreement before she signed it and that her attorney told her that the house payment was under John Dilling's responsibilities in the agreement. Finally, Ms. Dilling stressed that she would not have signed the agreement if she thought that the agreement required her to pay the house note. Other matters about which the Dillings testified were Mr. Dillings' belated and allegedly incomplete attempt to repair the roof on the marital home as their agreement required him to do and his failure to notify Ms. Dilling about his current address. Neither matter is the subject of Mr. Dilling's two issues, so we have omitted a narration of the Dillings' testimony on these two subjects.
¶ 17. After the Dillings rested, the chancellor found
that there was, in fact, a mistake in Paragraph 2 of the Child Support Custody and Property Agreement of the parties, and that the ex-husband should have been required to pay all the house notes, which include the taxes and the interest from the time that the Court approved that judgment, which was June the 11th, 1996, when the judgment was entered.
The chancellor ordered Mr. Dilling to bring the house notes current within sixty days and to begin paying the house note with the November payment. The court allowed six months for Mr. Dilling to repay Ms. Dilling for the three payments for which her parents paid. Mr. Dilling would also be required to pay Ms. Dilling for any charges required to keep the house out of foreclosure within sixty days after Ms. Dilling presented the charges to him.
¶ 18. The chancellor found Mr. Dilling in contempt of the court for violating the court's order regarding the provision that neither party would spend the night with a person of the opposite sex while the party had physical custody of the minor child. The court sentenced Mr. Dilling to be incarcerated in the Jackson County Jail for a period of five days beginning at 2:00 p.m. on November 26, 1996 and continuing until 5:00 p.m. on December 1, 1996. The chancellor ordered Mr. Dilling to pay Ms. Dilling $750 for attorney's fees, which he was allowed to pay at the rate of $150 per month for five months. The chancellor also ordered Mr. Dilling to pay the costs of court.
¶ 19. Mr. Dilling's attorney asked the trial judge to specifically denote the facts upon which he based his ruling that Mr. Dilling was in contempt of the court order. The court responded as follows:
I find that he is in wilful, contumacious contempt of this Court, for going on a camping trip to Arkansas for several days with his girlfriend, his daughter, and his girlfriend's child. The specific provisions in the Agreement prohibit that.... Paragraph 3, the parties say that the parties shall have no one of the opposite sex spend the night they're not *334 married to while the minor is in their custody. That's a specific violation of that provision[] of the Child Support, Custody and Property Settlement Agreement.
The court noted that Mr. Dilling admitted that he went on the camping trip and that he spent the night in the tent with his girlfriend and the children. The chancellor entered his initial written judgment on November 27, in which he sentenced Mr. Dilling to be incarcerated in the Jackson County Jail. A more detailed supplemental judgment was filed on December 9, 1996.

IV. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

A. Mr. Dilling's first issue

1. The Dillings' arguments
¶ 20. Mr. Dilling's first issue is "Whether the lower court erred in amending/modifying the property settlement agreement signed by the parties." Ms. Dilling's first and second issues are restatements of Mr. Dilling's first issue; thus, to resolve Mr. Dillings's first issue is to resolve Ms. Dillings's first two issues. Mr. Dilling argues that it was error for the chancellor to modify or to amend the judgment for divorce based on Ms. Dilling's motion to correct judgment which she filed pursuant to Rule 60 of the Mississippi Rules of Civil Procedure. To support his argument, Mr. Dilling provides the following quotation from Stringfellow v. Stringfellow, 451 So.2d 219, 221 (Miss.1984):
Rule 60(b) provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances, and that neither ignorance nor carelessness on the part of an attorney will provide grounds for relief. Additionally, it has been said that a party is not entitled to relief merely because he is unhappy with the judgment, but he must make some showing that he was justified in failing to avoid mistake or inadvertence; gross negligence, ignorance of the rules, or ignorance of the law is not enough.
(citing Hoffman v. Celebrezze, 405 F.2d 833 (8th Cir.1969)).
¶ 21. Mr. Dilling contends that Rule 60(b) can be no basis for the chancery court's modifying its judgment for divorce because it was Ms. Dilling's counsel's admission that she made a mistake when she drafted the agreement on which the chancellor based his decision to render him liable for the payment of the monthly mortgage payment, insurance premiums, and taxes on the marital home. Thus, because "neither ignorance nor carelessness on the part of an attorney will provide grounds for relief" pursuant to Rule 60(b), Mr. Dilling asserts that the chancellor erred in modifying the judgment of divorce based solely on Ms. Dilling's motion to correct judgment. In response, Ms. Dilling observes that she met the requirements for a modification pursuant to M.R.C.P. 60 and that, even under the rules of contract law, the court could properly reform the agreement to reflect the intent of the parties.

2. Standard of Review
¶ 22. An appellate court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion or was manifestly wrong, or the judgment was clearly erroneous, or an erroneous legal standard was applied. Denson v. George, 642 So.2d 909, 913 (Miss.1994); Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990). We acknowledge that this standard is particularly determinative "in the areas of divorce and child support." Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989). As the Mississippi Supreme Court has stated, "In family law, ... we recognize that that which has been finally adjudicated should not be relitigated." Tanner v. Roland, 598 So.2d 783, 786 (Miss.1992). However, we conduct a review de novo regarding questions of law. Denson, 642 So.2d at 913.

*335 3. Resolution of the issue

¶ 23. There are two facets to Mr. Dilling's first issue. The first is the reformation of the property settlement agreement, and the second is the amendment of the judgment of divorce. This Court reviews this issue from the vantage it would have if it were situated on the bluff of precedent located at the confluence of the currents flowing from the rivers of the jurisprudence of divorce, reformation of contract, and Rule 60 of the Mississippi Rules of Civil Procedure. Our resolution of Mr. Dilling's first issue rests somewhere below that confluence.

a. The divorce aspect
¶ 24. Because this case began as a divorce action in which the chancery court granted the Dillings a divorce on the grounds of irreconcilable differences, we begin our review by noting that Section 93-5-2(2) provides:
If the parties provide by written agreement for the custody and maintenance of any children of that marriage and for the settlement of any property rights between the parties and the court finds that such provisions are adequate and sufficient, the agreement may be incorporated in the judgment, and such judgment may be modified as other judgments for divorce.
Miss.Code Ann. § 93-5-2(2) (Rev.1994).
¶ 25. The Dillings executed their property settlement agreement pursuant to Section 93-5-2 as a prerequisite to the chancery court's granting them their divorce on the grounds of irreconcilable differences. It is noteworthy that Section 93-5-2(2) provides that "the agreement may be incorporated in the judgment, and such judgment may be modified as other judgments for divorce." (emphasis added). The chancery court incorporated the Dillings' property settlement agreement into its judgment for divorce so as to make it a part of its judgment of divorce.

b. The reformation aspect
¶ 26. In East v. East, 493 So.2d 927, 931-32 (Miss.1986), the Mississippi Supreme Court advised:
We have also historically recognized that parties may upon dissolution of their marriage have a property settlement incorporated in the divorce decree, and such property settlement is not subject to modification. A true and genuine property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character.
(emphasis added) (citation omitted). The supreme court then noted that Section 93-5-2 of the Mississippi Code "require[d] that the parties make a settlement of their property rights, and the agreement may be incorporated in the decree."
¶ 27. A contract may be reformed. In Johnson v. Consolidated American Life Ins. Co., 244 So.2d 400, 402 (Miss.1971), the Mississippi Supreme Court explained:
"The general rule in this state and elsewhere is that reformation of a contract is justified only (1) if the mistake is a mutual one, or (2) where there is a mistake on the part of one party and fraud or inequitable conduct on the part of the other. Allison v. Allison, 203 Miss. 15, 33 So.2d 289 (1948)."
However, "The mistake that will justify a reformation must be in the drafting of the instrument, not in the making of the contract." Johnson, 244 So.2d at 402. A scrivener's error may be sufficient to warrant the reformation of an instrument. See Sunnybrook Children's Home, Inc. v. Dahlem, 265 So.2d 921, 925 (Miss.1972) (holding that the evidence showed that grantor intended to convey land located in Range 7 East and that the omission of the range number was a scrivener's error which justified reformation of the description of the land attempted to be conveyed in the grantor's deed). Because the Dillings' *336 property settlement agreement was "no different from any other contract," it too could be reformed if there was a "mistake... in the drafting of the instrument."
¶ 28. In the case sub judice, the chancellor found that paragraph 2 of the Dillings's property settlement agreement contained a mistake because it "should [have] require[d] the defendant, John W. Dilling, to satisfy all house notes which include taxes and insurance." The testimony of Ms. Dilling's first attorney, Barbara Harvey, established that the omission of the word "husband" from paragraph 2 of the agreement was an error. Both she and Ms. Dilling explained that Mr. Dilling's receipt of 65% of the equity realized from the sale of their marital home was Ms. Dilling's concession to Mr. Dilling, who otherwise refused to sign the agreement which originally provided for an even division of the equity. During cross-examination, Ms. Dilling's counsel asked, "And isn't it true that you agreed that you would pay the house note?" Mr. Dilling replied, "No, sir; not after the divorce was final. I agreed to pay for it till the divorce was final." Later, when Mr. Dilling was asked why he thought "that [he] would have gotten almost twice as much as [his wife] when the house was sold?" he replied, "I don't know why she did that." The financial data about which Ms. Dilling testified, if correct, demonstrated the impossibility of her paying the monthly mortgage payment, insurance premiums, and taxes on the marital home.
¶ 29. This Court concludes that there was substantial evidence to support the chancellor's finding that paragraph 2 contained a mistake and that, therefore, he did not err when he reformed the Dillings' agreement to require Mr. Dilling to pay the specified expenses related to the Dillings' marital home. While he did not specifically find that the mistake was mutual, this Court further concludes that even if the mistake was only that of Ms. Dilling, which she made through her attorney's error of omission in drafting the Dillings' agreement, Mr. Dillings' conduct was sufficiently inequitable to warrant the reformation of their contract. We find his conduct to be inequitable because of his willingness to accept 65% of the marital home's equity without being able to explain why Ms. Dilling would agree to his receiving that much without his paying the payments we described.

c. Rule 60 of the Mississippi Rules of Civil Procedure
¶ 30. An anomaly would result if this Court were to affirm the chancellor's reformation of the Dillings' property settlement agreement but were to remain powerless to modify the judgment of divorce into which the chancellor incorporated the agreement. The anomaly would be a judgment of divorce which incorporated an erroneous property settlement agreement. Ms. Dilling filed not only a complaint for contempt, modification and for other relief but also a motion to correct judgment pursuant to Rule 60 of the Mississippi Rules of Civil Procedure.
¶ 31. In the supplemental judgment rendered on December 9, 1996, after the hearing had been concluded on November 26, 1996, the chancellor found that the judgment for divorce "contained a mistake and paragraph 2 of the judgment should require the Defendant, John W. Dilling, to satisfy all house notes which include taxes and insurance." The chancellor continued in this supplemental judgment:
That pursuant to Rule 60 of the Mississippi Rules of Civil Procedure, [Ms. Dilling] timely filed pleadings seeking relief from the Judgment and the Judgment shall be corrected and modified as follows with paragraph 2 now reading as follows:
That the wife shall have exclusive use and possession of the marital home located at 4817 Fordham Drive, Gautier, Mississippi, and the Husband, John W. Dilling, shall pay all house notes which includes taxes and insurance thereon. (emphasis added).
*337 The chancellor relied on Rule 60 for his authority to change the judgment of divorce to incorporate the reformed property settlement agreement. Our task is to determine whether Rule 60 gave him that authority.
¶ 32. Mr. Dilling contends that because counsel for his former wife made a mistake when she drafted the property settlement agreement, which her counsel really confessed, Rule 60 is no authority to support the chancellor's correction and modification of the original judgment of divorce. In Stringfellow v. Stringfellow, 451 So.2d 219, 221 (Miss.1984), the Mississippi Supreme Court noted:
Finally, the Fifth Circuit has held "consistently" that "relief from a judgment is not to be granted under Rule 60(b) simply because its entry may have resulted from incompetence or ignorance on the part of an attorney employed by the party seeking relief." Clarke v. Burkle, [570 F.2nd 824] at 831 [(8th Cir.1978)] (emphasis added).
Mr. Dilling argues that his former wife's counsel's confessed negligence in drafting the paragraph which the chancellor reformed constituted incompetence as contemplated in Stringfellow.
¶ 33. Whether Mr. Dilling's argument has merit, Rule 60 is not the sole authority for a chancery court's amendment, modification, or revision of a judgment of divorce. We earlier noted that Section 93-5-2(2) provides that a judgment which incorporates a property settlement agreement "may be modified as other judgments for divorce." Section 93-5-23 of the Mississippi Code further provides:
When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders ... touching the maintenance and alimony of the wife or the husband, or any allowance to be made to her or him, and shall, if need be, require bond, sureties or other guarantee for the payment of the sum so allowed.... The court may afterwards, on petition, change the decree, and make from time to time such new decrees as the case may require.

Miss.Code Anno. § 93-5-23 (Rev.1994) (emphasis added).
¶ 34. Rule 81 of the Mississippi Rules of Civil Procedure provides that the Mississippi Rules of Civil Procedure "are subject to limited application in ... actions which are generally governed by statutory procedures." Specifically, the Mississippi Supreme Court has recognized that Title 93 of the Mississippi Code often requires the Mississippi Rules of Civil Procedure to yield to statutory procedures. See Rawson v. Buta, 609 So.2d 426, 430 (Miss.1992) (holding that "Mississippi divorce actions are governed by the divorce and alimony provisions of section 93, chapter 5 of the Mississippi Code" and that "the procedural provisions of this chapter limit the applicability of the Mississippi Rules of Civil Procedure, which govern only where the divorce statute stands silent").
¶ 35. Regardless of whether Rule 60 was sufficient authority to support the chancellor's modification of the judgment of divorce which necessarily followed from his reformation of the Dillings's property settlement agreement, this Court holds that either Section 93-5-2(2) or Section 93-5-23 empowered the chancellor to modify the judgment of divorce by his entry of the supplemental judgment rendered December 9, 1996. Because this Court earlier found substantial evidence to support the chancellor's reformation of the property settlement agreement, this Court affirms the supplemental judgment entered on December 9, 1996, which both reformed the Dillings' property settlement agreement and modified the original judgment of divorce to include the reformed property settlement agreement.

B. Mr. Dilling's second issue
¶ 36. For his second proposition, Mr. Dilling asks, "Whether the lower court *338 erred in finding the Appellant in criminal contempt of court, necessitating the imposition of incarceration?" He asserts that the record fails to establish beyond a reasonable doubt that he engaged in wilful, malicious, contumacious conduct that would warrant the chancery court in holding him in contempt. He suggests that "[a]t best, [he] made a mistake in judgment for which he was sentenced to jail for five (5) days." Ms. Dilling emphasizes that substantial credible evidence existed to support the chancellor's decision and that the chancellor acted within his discretion in ordering Dilling's incarceration.
¶ 37. Mr. Dilling cites but one case, Langford v. Langford, 253 Miss. 483, 176 So.2d 266 (1965), in which the supreme court reversed the chancery court's conviction of the appellant of criminal contempt because the supreme court "conclude[d] that the evidence [was] not sufficient to show beyond a reasonable doubt that [Langford] was guilty of criminal contempt." 253 Miss. at 485, 176 So.2d at 267. In Langford, the supreme court explained, "Criminal contempt is punishment for a past offense, is quasi-criminal, and a defendant is assumed innocent until proved guilty beyond a reasonable doubt. The essence of the offense is that a defendant willfully, maliciously, and contumaciously has refused to comply with a decree of the court." Id.

1. Standard of Review
¶ 38. When a party violates a court order outside the presence of the judge, the violation constitutes constructive contempt. Jenkins v. State, 242 Miss. 627, 633, 136 So.2d 205, 207 (1962). Section 9-1-17 of the Mississippi Code (Supp. 1998) grants to the courts the authority to punish any person guilty of contempt by imposing a fine of up to One Hundred Dollars ($100.00) and imprisonment for up to thirty (30) days. (Supp.1998). The imposition of punishment for contempt of the court is within the discretion of the chancellor. Gebetsberger v. East, 627 So.2d 823, 826 (Miss.1993).
¶ 39. Procedural safeguards exist in contempt proceedings because the alleged contemnor could be deprived of property or liberty. Therefore, the party charged with contempt must be informed of the nature of the alleged contempt and afforded notice and a hearing on the allegations. Wood v. State, 227 So.2d 288, 289 (Miss.1969). Furthermore, the alleged contemnor has a right to counsel, he is cloaked in a presumption of innocence which can only be overcome by proof of his guilt beyond a reasonable doubt, and he may assert his right to abstain from testifying against himself. See Ridgway v. Baker, 720 F.2d 1409, 1413 (5th Cir.1983) (holding that the right to counsel extends to any litigant who may be deprived of liberty if he loses); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (holding that the defendant in a contempt case is presumed innocent, must be proven guilty beyond a reasonable doubt, and cannot be compelled to testify against himself). 2. Analysis

2. Analysis
¶ 40. We observe that the constitutional safeguards applicable to contempt cases are not issues in this case. Dilling was informed of the allegations against him, afforded notice and a hearing, and represented by counsel. Dilling asserts that his contempt was not proven beyond a reasonable doubt. However, the record confirms that Dilling told the court that he knew of the provision in the agreement that he was prohibited from overnight visitation with his minor child in the presence of a member of the opposite sex to whom he was not married. He also admitted that he did indeed spend several nights with his girlfriend while he had physical custody of his minor daughter during a camping trip in Arkansas in July, 1996. The lower court could reasonably conclude that Dilling's conscious choice to violate *339 the terms of the court's decree embodied willful, malicious, contumacious refusal to comply with the court order. His "mistake in judgment" was manifested as a conscious choice to violate the court's decree. The chancellor acted within his authority in incarcerating Mr. Dilling, and we find no abuse of discretion. Thus, we affirm the judgment of the Jackson County Chancery Court which held Mr. Dilling in its contempt and its sentence of incarceration of five days in the Jackson County Jail.

V. APPELLEE'S MOTION FOR ATTORNEY'S FEES ON APPEAL
¶ 41. Ms. Dilling, the appellee, has filed a motion for attorney's fees to compensate her attorney for his services "throughout this appeal ... including legal research, reading and analysis of transcript and evidence, preparation of [his client's] brief...." Her attorney attached to the motion for attorney's fees a statement for legal services in the amount of $1,750 for 17.5 hours of work @ $100 per hour. In Schilling v. Schilling, 452 So.2d 834, 836 (Miss.1984), the supreme court explained, "The usual award in a case such as this is one-half of the fee that was allowed or should have been allowed by the lower court." (citation omitted). In Schilling, the chancery court awarded the wife $7,500 in attorney's fees, and the supreme court awarded her $3,750 "for attorney's fees incurred on this appeal." Id. Pursuant to Schilling, this Court awards Ms. Dilling an attorney's fee in the amount of $375, or one-half of the attorney's fee which the chancellor awarded her in the amount of $750.
¶ 42. THE JUDGMENT OF CONTEMPT AND SUPPLEMENTAL JUDGMENT OF THE JACKSON COUNTY CHANCERY COURT ARE AFFIRMED. APPELLEE'S MOTION FOR ATTORNEY'S FEES SUSTAINED IN FAVOR OF APPELLEE IN THE AMOUNT OF $375.00 COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., DIAZ, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.
IRVING AND LEE, JJ., NOT PARTICIPATING.