MAXWELL, J.,
for the Court:
¶ 1. This appeal involves the mysterious disappearance and mistaken identity of a horse. Claiming she had not received the pregnant quarter horse she had bargained for, Laura Lane-Lott sued the man with whom she had traded her horse, as well as the two people who brokered the trade.
¶ 2. The circuit court dismissed her claims for fraud and damages under the Uniform Commercial Code (UCC) at the close of her presentation of the evidence. After review, we find the circuit court reached the right result, but for a slightly different reason than cited by the judge.
¶ 3. The circuit court found there had been a “mutual mistake” between the parties, which could have led to reformation of the trade agreement. But because reformation was impossible due to the uncoop-erativeness of Laura and the sale, loss, or destruction of the horses involved, Laura was not entitled to any remedy for the mistake. The circuit court also found she failed to prove any fraud.
¶ 4. We agree there had been a mutual mistake. But the mistake was not in the drafting of the contract, justifying the remedy of contract reformation. Rather, the mistake was a mutual mistake of fact concerning the identity and existence of the subject matter of the contract — the pregnant quarter horse. And when this type of mistake occurs, under both the common law and UCC, the contract is void. While Laura may have been entitled *1017 to be put back in the same place she was before the trade — an offer she refused— she was not entitled to any monetary damages. Because we also agree she failed to present a prima facie case of fraud, we affirm the judgment dismissing her claims against all three defendants.
Background Facts and Procedural History
¶ 5. Harold White and Anne Borgan White brokered a horse-trading deal between Laura and Gerald Gambrel. In the trade, Laura would swap her quarter-horse mare, Ima Slow Lopin Dream, in exchange for Gerald’s pregnant mare, Kcees Time to Skeik.
¶ 6. But after the swap, and after the mare Laura received gave birth, Laura attempted to register the foal with the American Quarter Horse Association (AQHA), only to learn that the foal did not have the bloodline Laura had desired. The foal’s mother, or “dam,” was not Kcees. Instead, DNA testing revealed that the mare who gave birth was in fact Miss Savannah Steel, a horse that had mysteriously disappeared from Harold’s farm a year before Laura and Gerald’s trade.
¶ 7. Apparently, Miss Savannah and Kcees were both being boarded at Harold and Anne’s farm in 2007. When Gerald came to pick up Kcees, he mistakenly took Miss Savannah instead. But neither he nor Harold and Anne realized the mix-up. In fact, around this same time, Miss Savannah’s owners came to claim her.[1] When she was nowhere to be found, and after diligently searching for her, Harold and Anne paid the owners $600 to compensate for their loss.
¶ 8. Later that year, Gerald returned the mare he thought was Kcees to Harold and Anne’s farm in order to breed her. Knowing Laura wanted to sell her mare, Ima, Harold brokered the deal in which Laura would trade Ima in exchange for Kcees. Laura testified she accepted the offer because she was familiar with Kcees’s bloodline, which in Laura’s estimation made the horse valuable. When the exchange took place, the quarter horse everyone believed to be Kcees was pregnant. She delivered a foal the following spring. It was not until that fall, when Laura attempted to register the foal with the AQHA, that DNA testing excluded Kcees as the foal’s dam. Further testing of the actual dam revealed the horse was in fact Miss Savannah.
¶ 9. According to Harold and Anne, while Laura was vociferous about not receiving Kcees, the quarter horse with the bloodline that she bargain for, she was not very forthcoming about the identity of the horse she actually did receive. She rejected Harold and Anne’s offer to trade her a mare of equivalent value to Ima. Instead, she insisted Harold and Anne pay her $9,000. Harold and Anne refused to pay that amount. So Laura sued them in the Pearl River County Circuit Court. She later added Gerald as an additional defendant. Her main allegation in her complaint was fraud. But she also alleged that the trade was governed by Article II of the UCC and prayed for special, incidental, and consequential damages under the UCC’s provisions.
¶ 10. The case was tried without a jury. At the onset, the parties stipulated that “the horse that [Laura] bargained for was not the horse received.” At the end of Laura’s presentation of the evidence, Harold, Anne, and Gerald moved for an involuntary dismissal under Mississippi Rule of Civil Procedure 41(b). The circuit court granted the motion and entered an order dismissing both of Laura’s claims against *1018 all three defendants. Despite the dismissal, the circuit court found Laura was entitled to $398 in damages. But the court also found that she also owed Harold and Anne $398 “for fees and boarding and veterinarian costs.” Because these damages offset, the court found that Laura “shall not receive any damages herein.”
¶ 11. Laura timely appealed, arguing the circuit judge erred when he granted the motion for involuntary dismissal under Rule 41(b). On appeal, we review the grant of the involuntary dismissal under the deferential substantial-evidence/manifest-error standard. Gulfport-Biloxi Reg’l. Airport Auth. v. Montclair Travel Agency, Inc., 937 So.2d 1000, 1005 (¶ 13) (Miss.Ct.App.2006).
Discussion

I. Mississippi Rule of Civil Procedure 41(b)

¶ 12. Rule 41(b) applies in actions, like this one, “tried by the court without a jury,” where the judge is also the fact-finder. When the defendant files a motion to dismiss following the presentation of the plaintiffs evidence, if “after viewing the evidence fairly, ... the judge would find the for defendant,” then the “judge should grant [the] motion for involuntary dismissal[.]” Gulfport-Biloxi Reg’l. Airport Auth., 937 So.2d at 1005 (¶ 13). Stated differently, the judge “must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiffs evidence were all the evidence offered in the case.” Id. at 1004-05 (¶ 13) (quoting Stewart v. Merchs. Nat’l. Bank, 700 So.2d 255, 259 (Miss.1997)).
¶ 13. Here, the circuit judge concluded he was not obliged to find for Laura, based on her evidence. We find no manifest error in this conclusion. The circuit judge found that Laura failed to show Harold, Anne, or Gerald had known that the horse traded for Ima was not Kcees. Instead, the stipulated fact that the horse Laura bargained for was not the horse Laura received was a product of a mutual mistake.

II. Mutual Mistake of Fact

¶ 14. While we defer to the circuit judge’s factual finding of a mutual mistake, we must clarify what type of mistake it was and what effect it had on the contract to trade horses.
¶ 15. The circuit judge characterized the mistake as occurring in the drafting of the sales contract, triggering the remedy of reformation. But he found not only that Harold and Anne’s efforts to reform the contract or mitigate the damages were “not successful” but also that it was “difficult or impossible for such reformation to occur since the subject animals were sold, lost, or destroyed.”
¶ 16. “A contract may be reformed” if there is a mutual mistake. Townsend v. Townsend, 859 So.2d 370, 376 (¶ 21) (Miss.2003) (emphasis added) (quoting Dilling v. Dilling, 734 So.2d 327, 335 (¶ 27) (Miss.Ct.App.1999)). But “[t]he mistake that will justify a reformation must be in the drafting of the instrument,” such as a scrivenor’s error, “not in the making of the contract.” Id. In this case, Laura was not seeking contract reformation — she was seeking contract enforcement. She did not allege or attempt to prove there was an error in the drafting of the sales contract or title to the horse she received. In fact, her whole claim was that the contract and title were right — it was the horse that was wrong.
¶ 17. In other words, Laura was not seeking to change the documents related to the trade to say “Miss Savannah” instead of “Kcees” because the pregnant mare she selected to trade with Gerald turned out to be Miss Savannah. Neither *1019 were Harold and Anne claiming the intent was to trade Miss Savannah, even through they all mistakenly referred to the pregnant mare as “Kcees.” Instead, the parties stipulated that “the horse ... bargained for was not the horse received.” So the mistake was not that the contract Laura sought to enforce did not reflect the true bargain. Were that the case, we would agree with the circuit judge that “[t]he remedy for [the] mutual mistake is reformation” — a remedy that is no longer possible. Bert Allen Toyota, Inc. v. Grasz, 909 So.2d 763, 768 (¶ 15) (Miss.Ct.App.2005).
¶ 18. Instead, the mutual mistake was in the identity of the subject matter of the bargain — the horse. This type of mistake is governed by the “doctrine of mutual mistake of fact.” Greer v. Higgins, 338 So.2d 1233, 1236 (Miss.1976). “A mutual mistake (of fact) is one common to both parties to a contract ... wherein each labors under the same misconception respecting a material fact[.] ... The mistake may apply to the nature of the contract, the identity of the person with whom it is made, or the identity or existence of the subject matter[.]” Id. (quoting 17 C.J.S. Contracts § 144, p. 894). And “where both parties at the time of the agreement were operating under a mutual mistake of fact,” the “contract may be set aside.” White v. Cooke, 4 So.3d 330, 334 (¶ 15) (Miss.2009) (citing Greer, 338 So.2d at 1236); see also Greer, 338 So.2d at 1236 (cancelling quitclaim deeds because all parties mistakenly believed the decedent’s property had been transferred by intestate succession, when in fact the decedent had a will).
¶ 19. The facts of this case present a spin on the classic example of a mutual mistake of fact. Were we to go back more than a century and ask a judge or horn-book professor to illustrate mutual mistake of fact, we would likely be given the following scenario: “A. agrees to buy a certain horse from B. It turns out that the horse is dead at the time of the bargain, though neither party was then aware of the fact. The agreement is void.” Riegel v. Am. Life Ins., 153 Pa. 134, 25 A. 1070, 1073 (1893); see also, e.g., Duncan v. N.Y. Mut. Ins., 18 N.Y.S. 863, 864 (1892) (“If A. sells his horse to B., and it turns out that the horse was dead at the time, though the fact was unknown to the parties, the contract is necessarily void[.]”); Ruohs v. Third Nat’l. Bank, 94 Tenn. 57, 28 S.W. 303, 308 (1894) (“A mutual mistake as to an existing fact is unquestionably ground for relief and rescission; as, for instance, if a horse should be the subject-matter of sale, and should be dead when the sale was made, and neither party knew of that fact.”).
¶ 20. Here, Laura agreed buy a certain horse from the Whites, Kcees. While it is unclear whether Kcees had gone to that great pasture in the sky or was just in another earthly pasture at the time of the agreement, what is clear is that both parties were laboring under the misconception that the mare that had been impregnated was Kcees. Thus, the contract was void because at the time of formation neither party knew that an expecting Kcees did not exist. See Plaut v. Marks, 5 Ohio Cir. Dec. 317, 319 (Ohio Cir.Ct.1895) (“As where one attempts to sell a horse, or a stock of goods, supposed by the contracting parties to be in existence but which in fact is not, the price paid therefor must be returned.” (emphasis added)).

A. Effect on UCC-Damages Claim

¶ 21. The same principle carries over into Article II of the UCC, the statutory body of law that governed the sales contract between the Whites and Laura. ‘Where the contract requires for its performance goods identified when the con *1020 tract is made, and the goods suffer casualty without fault of either party before the risk of loss passes to the buyer, ... if the loss is total the contract is avoided[.]” Miss.Code Ann. § 75-2-613 (Rev.2002). As the comment notes, this “section applies [when] the goods were already destroyed at the time of contracting without the knowledge of either party[.]” The contract required the Harold and Anne to deliver a specifically identified pregnant mare, Kcees. But at the time of contracting, unbeknownst to either party, Kcees had already been misplaced and had not been impregnated due to Gex-ald’s mix-up. Thus, the sales contract was “avoided.” Id. Because the sales contract was void, Laura’s claim for UCC damages — either actual, incidental, and/or consequential to the breach of the sales contract — was properly dismissed.
¶ 22. Instead of Laura being entitled to receive the benefit of her bargain under the sales contract, the law allowed Laura to be put back in the same place she was before the contract was formed based on the mutual mistake of fact. But once the mistake was discovered, Laura stymied any efforts by Harold and Anne to restore her to the same place. Instead, she insisted on trying to obtain money from them, even though they had co-labored under the same misconception. Thus, we find no abuse of discretion in the judge finding that the only expenses Laura was able to prove she incurred based on the busted deal were equal to Harold and Anne’s, thereby setting off her award of $398 with an order she pay them the same amount.

B. Effect on Fraud Claim

¶ 23. Because the circuit judge found Harold, Anne, and Gerald were as equally mistaken as Laura, we also find no abuse of discretion in the judge dismissing her fraud claim. To make a prima facie case of fraud, Laura had to prove by clear and convincing evidence that Harold, Anne, and Gerald not only falsely represented that the horse Laura traded for Ima was Kcees but that they knew this representation was false. See Franklin v. Lovitt Equip. Co., 420 So.2d 1370, 1373 (Miss.1982) (listing nine elements of fraud, which include “the speaker’s knowledge of [the] falsity” of the material representation). Because it was not until well after the trade that Harold, Anne, and Gerald realized the .mix-up between Kcees and Miss Savanah, Laura could not prove they knew that the horse Laura was going to receive in the trade was not Kcees. Thus, Laura could not prove she was defrauded.
¶ 24. Because the circuit judge properly dismissed both of Laura’s claims following her presentation of the evidence, we affirm.
¶ 25. THE JUDGMENT OF THE PEARL RIVER COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P. JJ., BARNES, ISHEE, ROBERTS, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.

. Miss Savanah’s owners are not part of this lawsuit.