# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00272-COA

**JOHN WILKAITIS, M.D.**                                                              APPELLANT

**v.**

**MISSISSIPPI CHILDREN'S HOME SOCIETY**                               APPELLEE
**D/B/A CANOPY CHILDREN'S SOLUTIONS**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/13/2020 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | T. JACKSON LYONS |
| ATTORNEYS FOR APPELLEE: | HUGH RUSTON COMLEY C. JOYCE HALL |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/31/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WILSON, P.J., McCARTY AND SMITH, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     A doctor contracted with a treatment facility. Both parties mistakenly calculated the fair market value of his compensation. After the treatment facility unilaterally reduced his salary, the doctor sued for breach of contract. The court rescinded the contract based upon a finding of mutual mistake. Aggrieved, the doctor appeals from the chancery court's judgment.

## FACTS

¶2.     Dr. John Wilkaitis is a physician specializing in child psychiatry. He previously served as the chief medical officer of Brentwood Behavioral Health Services. In addition to

his medical-director and in-patient services at Brentwood, Dr. Wilkaitis also established Children's Psychiatric Services PLLC, an out-patient private practice.

¶3.    Canopy Children's Solutions is a non-profit provider of educational, behavioral, and social services. Canopy contacted Dr. Wilkaitis regarding a position as its medical director. The parties also discussed Canopy's purchasing Dr. Wilkaitis' out-patient practice.

*A.    A mistake is made during appraisal.*

¶4.    During negotiations, Canopy hired the public accounting firm Horne LLP to appraise the fair market value of the practice and provide a compensation evaluation for the medical director position. Horne gave Dr. Wilkaitis a checklist of information needed to perform the appraisal. This information included the practice's revenues generated from all sources. The doctor complied and provided Horne with the requested information, including revenues from both in-patient and out-patient services. It was understood by Canopy and Dr. Wilkaitis that the in-patient services would be omitted from the evaluation.

¶5.    Horne reported that the fair market value for a 100% interest in the practice was $662,000, and the practice's furnishings were valued at $151,000. The compensation evaluation recommended an annual base salary of $300,000 for clinical services and $120 an hour for purely medical-director services. Horne recommended that Dr. Wilkaitis' annual compensation not exceed a combined total of $851,000. The parties agreed that Canopy would purchase the practice for $500,000 and that Dr. Wilkaitis would serve as Canopy's medical director at the salary Horne recommended.

¶6. Shortly thereafter, Canopy informed Dr. Wilkaitis that upon advice of counsel, it could not directly purchase his practice. Yet instead of forgoing the sale altogether, Canopy suggested an employment agreement under which Dr. Wilkaitis would receive a signing bonus and additional compensation during the first two years of his employment with Canopy. The doctor agreed to the new arrangement, and the parties signed a two-year contract.

¶7. Under the terms of the contract, Dr. Wilkaitis would receive an annual salary of $550,000 during his first twenty-four months of employment and a one-time $50,000 signing bonus. After twenty-four months, Dr. Wilkaitis' annual salary would be reduced to $300,000. The agreement also contained a non-compete provision, preventing Dr. Wilkaitis from engaging in any business that would conflict with his obligations to Canopy. An exception within the provision allowed Dr. Wilkaitis to continue providing in-patient services at Brentwood for the first year of the contract.

B.    *The mistake in compensation is discovered.*

¶8. Following the contract's execution, Dr. Wilkaitis transferred thousands of his patients to Canopy and moved his office to Canopy's building. Canopy sold the furnishings and terminated the lease for Dr. Wilkaitis' office and clinic at Brentwood. During his tenure at Canopy, Dr. Wilkaitis served as the medical director, provided out-patient services, and facilitated the re-accreditation of Canopy's treatment facility. The re-accreditation allowed Canopy to continue receiving payments from Medicaid for covered services.

3

¶9.    A little over a month into the contract, Canopy's chief financial officer expressed concerns to Dr. Wilkaitis that his generated revenue was significantly less than Canopy had anticipated based on the pre-contract appraisal. The officer continued to share these concerns over the next several months. Eventually, Canopy hired Horne to re-evaluate the fair market values of Dr. Wilkaitis' practice and compensation.

¶10.    Horne realized during the second evaluation that it had originally made a mistake by including revenues from both in-patient and out-patient services. Because Canopy is a treatment center and not a hospital, it cannot provide in-patient services. Accordingly, the in-patient revenue should not have been included in the valuation since Canopy would not be providing in-patient services.

¶11.    Like Canopy, Dr. Wilkaitis was also mistaken as to how his compensation was calculated. The doctor would later testify he "thought the salary seemed high." He stated that he believed Horne could "figure out" the billing codes and assumed Horne omitted the in-patient services from its calculation of what fair market value compensation would be. Furthermore, Dr. Wilkaitis testified he knew Canopy did not provide in-patient services and "figured [Horne] knew enough about coding" to exclude the in-patient services from his compensation package.

¶12.    The second evaluation excluded the in-patient revenues and only analyzed revenues for out-patient services. The new report recommended an annual salary of $416,000 for purely clinical services rendered by Dr. Wilkaitis and $57,600 for services he provided as the

medical director. Horne recommended that the medical director's total annual compensation not exceed $473,600—around $76,000 less than the agreed upon salary.

¶13. Upon learning of the error, Canopy's chief operating and financial officers promptly met with Dr. Wilkaitis to discuss the mistake. The doctor testified that he believed he had until the end of the year to "figure things out" and would be included in any discussions concerning a reformation of his employment agreement.

¶14. Instead, Dr. Wilkaitis was given a letter from Canopy's attorney explaining, "[T]he claims generated by those inpatient services should not have been included in the fair market value analysis used to determine the fair market value of compensation for your position." The letter also informed the doctor that his annual compensation had been reduced to $443,282 due to the mistake. When he received his next paycheck, Dr. Wilkaitis realized that his biweekly pay had been reduced by more than 90% in order to bring his 2018 compensation within the new maximum fair market value claimed by Canopy.

¶15. In response to this significant reduction in salary, Dr. Wilkaitis delivered a notice of default to Canopy. The following month Canopy invoked the contract's "without cause" termination provision, which allowed either party to "terminate [the] Agreement without cause by providing the other party at least ninety (90) days prior written notice[.]" The doctor was instructed not to return to work during those ninety days.

C. Dr. Wilkaitis sues Canopy for breach of contract.

¶16. Following his termination, Dr. Wilkaitis filed a lawsuit in chancery court. He asserted

claims of breach of contract, unjust enrichment, breach of good faith and fair dealing, and an intentional wrong or gross negligence.

¶17. Canopy then terminated Dr. Wilkaitis "for cause," alleging he violated the anti-compete provision of the employment agreement, intentionally cut off Canopy's access to its electronic health records, and solicited patients to stop doing business with Canopy.[1]

¶18. After a trial on the matter, the chancellor found "a mutual mistake occurred in the contract" and rescinded the employment agreement. Ultimately, the trial court found "beyond a reasonable doubt, that both parties were operating under a mutual mistake regarding the actual fair market value of the compensation to be received by Dr. Wilkaitis due to the inclusion of in[-]patient service codes."

¶19. The court concluded, "Canopy mistakenly believed that it was receiving more than $500,000 worth of services under the contract which were actually in[-]patient services not performed at or on behalf of Canopy." Likewise, "Dr. Wilkaitis mistakenly believed that he would receive the entirety of the compensation package in addition to approximately $500,000 per year in in[-]patient services; he further mistakenly believed that in[-]patient service codes were excluded from his compensation and the same was based upon accurate fair market value analysis."

¶20. As a result, the chancellor found that "[a]t the time that the employment agreement

---

[1] Canopy filed a counterclaim against Wilkaitis for tortious breach of contract. Following the counter-suit, Dr. Wilkaitis let Canopy back into the electronic health records system, and Canopy dropped its counterclaim.

was signed, both parties were operating under a mutual mistake of fact, specifically with regard to the value of services to be provided under the contract and with regard to the fair market value analysis of such services in accordance with federal law and regulation."

¶21. The court ordered that the parties were released "from any and all obligations contained within the employment agreement." Dr. Wilkaitis was released from the non-compete provision, and Canopy was released from all compensation requirements.

¶22. Aggrieved, Dr. Wilkaitis appeals the chancery court's findings.

## ANALYSIS

¶23. Dr. Wilkaitis claims the chancery court erred by rescinding the employment agreement based on a finding of mutual mistake.

¶24. We "will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *White v. Cooke*, 4 So. 3d 330, 333 (¶12) (Miss. 2009) (alteration in original).

¶25. "A mutual mistake between parties is where a variance exists between their agreement and the instrument intended to express it." *Tommy Brooks Oil Co. v. Wilburn*, 243 So. 3d 166, 170 (¶14) (Miss. 2018) (internal quotation mark omitted). "Further, a mutual mistake is a defense to contract formation." *Id.* "[T]he burden of proof is upon the party trying to establish mutual mistake[,] and the proof must establish such a mistake beyond a reasonable doubt." *Milligan v. Milligan*, 956 So. 2d 1066, 1076 (¶32) (Miss. Ct. App. 2007).

7

¶26. "A contract *may* be reformed if there is a mutual mistake." *Lane-Lott v. White*, 126 So. 3d 1016, 1018 (¶16) (Miss. Ct. App. 2013) (internal quotation mark omitted) (emphasis in original). "But the mistake that will justify a reformation must be in the drafting of the instrument, such as a scrivenor's error, not in the making of the contract." *Id*. (cleaned up).

¶27. On the other hand, a mutual mistake *of fact* "is unquestionably ground for relief and rescission." *Id*. at 1019 (¶19). "A mutual mistake of fact is one common to both parties to a contract, wherein each labors under the same misconception respecting a material fact." *Id*. at (¶18) (cleaned up).

¶28. The classic example of mutual mistake includes the hypothetical sale of a dead horse. "[F]or instance, if a horse should be the subject-matter of sale, and should be dead when the sale was made, and neither party knew of that fact[,]" then performance of the contract will be excused due to mutual mistake. *Id*. at (¶19).

¶29. The case of *Lane-Lott* provided a twist on the classic dead-horse situation. A woman contracted to trade her horse from a stable owner for a pregnant mare named Kcees. *Id*. at 1017 (¶5). But after the horse gave birth, the woman discovered that the mare was actually not Kcees, but another horse named Miss Savannah. *Id*. at (¶6).

¶30. Prior to the agreement, Kcees had been boarded at a farm. *Id*. at (¶7). It turns out that when Kcees' owner went to pick her up, he mistakenly took home a different horse he only thought was Kcees. *Id*. The mare that the buyer received was actually Kcees' imposter. *Id*. at (¶8). The buyer sued the stable owner for fraud and damages. *Id*. at (¶9).

8

¶31.    This Court found that there was a mutual mistake "in the identity of the subject matter of the bargain—the horse." *Id*. at 1019 (¶18). "[B]oth parties were laboring under the misconception that the mare that had been impregnated was Kcees." *Id*. at (¶20). We held that the contract was void as a result of the mutual mistake "because at the time of formation neither party knew that an expecting Kcees *did not exist*." *Id*. (emphasis in original).

¶32.    This case is very close to *Lane-Lott*. Here, the chancery court found "beyond a reasonable doubt . . . that a mutual mistake occurred in the contract." Specifically, that "both parties were operating under a mutual mistake regarding the actual fair market value of the compensation to be received by Dr. Wilkaitis due to the inclusion of inpatient services code." For Canopy mistakenly believed it would be receiving $500,000 worth of out-patient services from Dr. Wilkaitis, but that value was inflated since it included both in-patient and out-patient services. Dr. Wilkaitis was likewise mistaken as to the fair market value of the out-patient services he provided for Canopy since he had assumed the third-party appraisal would exclude the value of the in-patient services.

¶33.    Accordingly, the chancery court did not clearly err by finding that both parties were mistaken as to a material fact—the fair-market value of the services Dr. Wilkaitis would provide at Canopy. The value was inflated because both parties labored under the mistaken belief that Horne only included out-patient services in the evaluation. Yet it is uncontested that the revenue for in-patient services was also included.

¶34.    Like in *Lane-Lott*, where the parties bargained for Kcees but got Miss Savannah, the

parties here contracted for compensation they believed reflected only the fair market value of Dr. Wilkaitis' out-patient services. Because both parties formed the contract based on this mutual mistake, we cannot find that the chancery court erred by rescinding the contract based on a finding of mutual mistake.

## CONCLUSION

¶35. A mutual mistake of fact existed in the formation of the employment agreement. As a result, the contract should be rescinded. For these reasons, the chancery court's judgment is affirmed.

¶36. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. CARLTON, P.J., NOT PARTICIPATING.**