# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-00679-SCT

*IN THE MATTER OF THE DISSOLUTION OF
THE MARRIAGE OF KELLY DREW WOOD,
HUSBAND, AND MELISSA WEEKS WOOD,
WIFE: MELISSA WEEKS WOOD*

*v.*

*KELLY DREW WOOD*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/25/2009 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | KRISTEN WOOD WILLIAMS |
| | MARC D. AMOS |
| ATTORNEY FOR APPELLEE: | TIMOTHY C. HUDSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED – 05/27/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Melissa Weeks Wood appeals the Lowndes County Chancery Court's valuation and

equitable distribution of a joint retirement savings account.  Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     Melissa and Kelly Wood were married in 1990 and separated on April 24, 2008.

Subsequently, they filed a joint bill for divorce on the ground of irreconcilable differences.

On May 2, 2008, Melissa and Kelly executed an "Agreement Concerning the Custody,

Support of and Visitation with Minor Children and Settlement of Property Rights Made in

Contemplation of Obtaining a Divorce on the Ground of Irreconcilable Differences" ("the

Agreement").  The Agreement included the following provision, at Section VIII(b).

> Husband and Wife acknowledge, contract and agree that Wife shall receive the sum of Two Hundred Three Thousand Two Hundred and no/100 Dollars ($203,200.00) from the GGC savings account which has an estimated balance of Three Hundred Seventy[-]Six Thousand and no/100 Dollars ($376,000.00). Husband shall receive the sum of One Hundred Seventy[-]Two Thousand Eight Hundred and no/100 Dollars ($172,800.00).[1]

 The chancellor granted the parties an irreconcilable-differences divorce on August 12, 2008,

and incorporated the Agreement into the final "Judgment of Divorce."

¶3.     On January 12, 2009, Melissa filed a Motion for Contempt in the trial court.  She

asserted that "as of the date of filing of this Motion, [the $203,200] had not been paid to

[her,]" as required by the Agreement and the final Judgment of Divorce. Melissa averred that

she had requested that Kelly transfer the money into her separate IRA account as early as

September 2008, but Kelly had refused.  Melissa stated that, after Kelly's first refusal, she

had told him that she wanted her money by the end of the year (2008), even though she

requested the transfer again in November 2008.  Melissa prayed that the trial court hold Kelly

in contempt and order him to pay her the $203,200.

¶4.     Kelly responded by filing a "Motion for Clarification."  In it, he asserted that "the

decline in this account due to the global economic situation has rendered it impossible to

perform as stated in the [divorce decree] due to the fact that the account is substantially lower

---

[1] The "GGC" account is a retirement savings account administered by Georgia Gulf Corporation.  The account is labeled in periodic reports as the "Old Vista Rollover IRA," and in Kelly's spreadsheet, it is called the "Joint IRA - Fidelity."

than three hundred seventy-six thousand dollars ($376,000.00)." Kelly further argued that "the applicable percentages of the account at the time of the divorce was the Wife receiving 54% and the Husband receiving 46%." Thus, Kelly asked the chancellor to "clarify the aforementioned provision of the Divorce [Judgment] and [have] the Parties divide the current balance of the GGC savings account pursuant to the percentages set forth above."

¶5.     A hearing on Melissa's contempt motion was held on March 9, 2009. At the hearing, when asked why he did not transfer the money on August 12, 2008, the date of divorce, Kelly responded that it was impossible for Melissa to receive $203,200 and for Kelly to receive $172,800 as stated in the agreement, because there was not enough money to accomplish this.[2] Kelly also asserted that he was unaware of the existence of a qualifying account to which to transfer the money, and that he did not receive the appropriate account information to make the transfer until February or March 2009. However, Melissa averred that, when she requested the transfer in September, she had told Kelly that the account information was in the former marital home, where Kelly continued to live.

¶6.     On March 25, 2009, the chancellor issued his final judgment, ruling in favor of Kelly. The chancellor's analysis, states, in pertinent part, that:

---

[2] An account spreadsheet provided by Kelly at the contempt hearing listed the value of the account at various times as follows:

| | |
|---|---|
| April 23, 2008: | $375,919.00. |
| May 1, 2008: | $376,319.64. |
| May 31, 2008: | $389,150.89. |
| July 1, 2008: | $374,886.33. |
| July 31, 2008: | $365,106.65. |

Kelly argues that it was always the intent of the parties that Melissa receive 54% of the account, and he 46%. He argues that these percentages should still apply no matter what amount is in the account. He further argues it was not the parties intent that the one party get all of the funds[,] which is essentially what would happen if Melissa were to receive the full amount of $203,200.00 at this point.[3]

This Court is inclined to agree with Kelly. Exhibit P4 clearly shows that Kelly was to receive 46% of the subject account.[4] Furthermore, Melissa did not establish to this Court's satisfaction that she provided the necessary information to effect the roll over until 2009, after the current litigation began. Finally, this is a Court of equity and it would be patently unfair for Kelly to be the sole bearer of the stock market losses, a situation that was beyond either parties' control.

Thus, the chancellor ordered that "Kelly shall transfer to Melissa's account 54% of any monies therein as of April 1, 2009[, and] Kelly shall retain the remaining 46%." Melissa filed an unsuccessful Motion for a New Trial or, Alternatively, to Amend Judgment.

¶7. Melissa timely appealed the chancellor's "clarification" of the divorce judgment on April 23, 2009. On appeal, Melissa argues that: (1) the property settlement agreement was a valid, unambiguous contract which was not subject to modification or clarification by the chancery court; (2) alternatively, even if the agreement was subject to contract interpretation,

---

[3] The chancellor noted that "[a]t the time of [the hearing], Kelly testified that the GGC account had a balance of approximately $206,000.00."

[4] Exhibit P4 is a spreadsheet Kelly prepared prior to the execution of the Agreement, which listed the parties' assets and the portions thereof to be distributed to each party (the "Split"). Kelly's portion of the GGC account is given as $172,719, and Melissa's is given as $203,200. In the "Split" column next to Kelly's amount, Kelly's percentage of the account is given as "46%." Melissa introduced the spreadsheet to prove the parties' intent was to separate the GGC account according to the specific dollar amounts. Melissa does not dispute that the dollar amounts given in the Agreement were taken from the spreadsheet, but she disputes that the dollar amounts were derived from the application of the percentages.

the documentary evidence showed that the parties intended to divide the GGC account according to specific dollar amounts, not percentages of the balance therein; and (3) alternatively, even if the parties intended to divide the account according to percentages, those percentages should have been calculated as of the date of divorce, on August 12, 2008, as opposed to April 1, 2009.[5]

## STANDARD OF REVIEW

¶8.     We employ a limited standard of review in domestic relations cases. "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Duncan v. Duncan*, 774 So. 2d 418, 419 (Miss. 2000) (citing *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (Miss. 1999)). "Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce, alimony and child support, this Court will not overturn the court on appeal unless its findings were manifestly wrong." *Id.* For questions of law, our standard of review is de novo. *Id.* (citing *Consol. Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999)).

## DISCUSSION AND ANALYSIS OF LAW

I.     **Whether the chancellor erred in modifying or reforming the contract by applying the percentages, as opposed to the specific dollar amounts.**

¶9.     Because they are intertwined, Melissa's first two asserted errors will be discussed together. This Court historically has recognized that a property settlement agreement "is no

---

[5] Melissa's asserted issues have been rephrased for clarity.

5

different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character." ***Townsend v. Townsend***, 859 So. 2d 370, 376 (Miss. 2003) (quoting ***East v. East***, 493 So. 2d 927, 931-32 (Miss. 1986)). This Court uses a three-tiered approach to contract interpretation. Put simply, step one is to look to the four corners of the agreement to attempt to translate a clear understanding of the parties' intent; only if that intent remains illusive may a court apply the canons of contract construction or turn to parol evidence. ***Harris v. Harris***, 988 So. 2d 376, 378-79 (Miss. 2008) (citing ***Tupelo Redev. Agency v. Abernathy***, 913 So. 2d 278, 283 (Miss. 2005). "[I]t is a question of law for the court to determine whether a contract is ambiguous. In the event of an ambiguity, the subsequent interpretation presents a question of fact for the trier of fact which we review under a substantial evidence/manifest error standard." ***Harris***, 988 So. 2d at 378. "Where terms of a contract are ambiguous, the contract will be interpreted in a reasonable manner." ***Id.***

¶10.    By agreeing with Kelly, the chancellor found that the contract was ambiguous with respect to the parties' intent regarding how the account should be divided. Thus, the chancellor found that, at the time they entered into the Agreement, Melissa and Kelly intended that, regardless of the account's value, Melissa would receive 54% of the account's balance, and Kelly would retain 46%, instead of the specific dollar amounts stated in the Agreement.

¶11.    We cannot say that the chancellor erred in reaching this conclusion. The specific dollar amounts given in Section VIII(b) of the Agreement were expressly based on an

6

*estimate* of the GGC account's balance. But that estimate turned out to be incorrect at the time of the divorce, when the Agreement became effective. The Agreement thus indicates that, by incorporating an estimate into the Agreement and basing their respective shares of the account on that estimate, Kelly and Melissa essentially intended to divide the GGC account according to an indefinite and fluctuating account balance. As such, Section VIII(b) did not clearly specify the parties' intentions with respect to the distribution of the account, so it was ambiguous. Hence, the chancellor was free to apply the canons of contract construction and consider parol evidence to determine the meaning of Section VIII(b). One canon of contract construction is that "uncertainties should be resolved against the party who prepared the instrument." *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352-53 (Miss. 1990) (citing *Clark v. Carter*, 351 So. 2d 1333, 1334 & 1336 (Miss. 1977)). Here, Melissa's attorney drafted the Agreement, so it should be construed against her interpretation of Section VIII(b). And after reviewing all the exhibits presented as parol evidence, including the spreadsheet in exhibit P4 offered by Melissa, the chancellor determined that the exhibits "clearly show[] that Kelly was to receive 46% of the subject account." This conclusion was based on substantial evidence, and we cannot say that it was manifest error.

¶12. Alternatively, to the extent that the parties did in fact intend to divide the account according to the specific dollar amounts, the incorrect estimate of the account's balance rendered performance of the contract impossible, such that the chancellor had little choice but to apply the percentages. Recognizing that, as of the date of the contempt hearing, the GGC account had an estimated total balance of only $206,000, the chancellor agreed with

7

Kelly that it would be impossible for the parties to perform their duties and for each party to receive the specific dollar amount under Section VIII(b).

¶13. Impossibility of performance of a contract "is determined by whether an unanticipated circumstance has made performance of the promise *vitally different* from what should reasonably have been within the contemplation of *both parties* when they entered into the contract." *Hendrick v. Green*, 618 So. 2d 76, 79 (Miss. 1993) (citing *Littleton v. Employees Fire Ins. Co.*, 169 Colo. 104, 453 P.2d 810 (1969)) (emphasis added). The doctrine of impossibility of performance of a contract was adopted by this Court as early as 1919. *In re Guardianship of Lane*, 994 So. 2d 757, 763 (Miss. 2008) (citing *Piaggio v. Somerville*, 119 Miss. 6, 80 So. 342, 344 (1919)) (internal citations omitted). We explained the doctrine as follows:

> There are . . . certain classes of events the occurring of which are said to excuse from performance [of the contract] because "they are not within the contract," for the reason that it cannot reasonably be supposed that either party would have so intended had they contemplated their occurrence when the contract was entered into, so that the promisor cannot be said to have accepted specifically nor promised unconditionally in respect to them. These three classes are: First, a subsequent change in the law, whereby performance becomes unlawful. Second, the destruction, from no default of either party, of the specific thing, the continued existence of which is essential to the performance of the contract. And, third, the death or incapacitating illness of the promisor in a contract which has for its object the rendering by him of personal services.

*Id.* (quoting *Piaggio*, 119 Miss. 6, 80 So. at 344). The instant case falls into the second class of events, "the destruction, from no default of either party, of the specific thing, the continued existence of which is essential to the performance of the contract." *Id.*

8

¶14.   The Agreement stated that Melissa "shall receive the sum of Two Hundred Three Thousand Two Hundred and no/100 Dollars ($203,200.00) from the GGC savings account . . . ." Because Kelly controlled the account at the time of divorce, this provision imposed a duty upon Kelly to *transfer* that amount to Melissa. However, the Agreement also stated that Kelly "shall receive the sum of One Hundred Seventy[-]Two Thousand Eight Hundred and no/100 Dollars ($172,800.00)." This provision imposed a duty on Melissa to *allow* Kelly to keep that amount. Based on the total estimated balance of the account ($376,000), Melissa receiving $203,200 and Kelly receiving $172,800 was "reasonably . . . within the contemplation of *both parties* when they entered into the contract." **Hendrick**, 618 So. 2d at 79 (emphasis added).

¶15.   However, as Kelly stated at the contempt hearing, it was impossible for Melissa to receive $203,200 **and** for Kelly to receive $172,800 as stated in the agreement, because there was not enough money to accomplish this. As early as July 1, 2008, there was only $374,886.33 in the account, and on July 31, 2008, the GGC account had a balance of only $365,106.65. Thus, the parties' duties under Section VIII(b) were rendered impossible to perform long before their divorce was finalized on August 12, 2008. In other words, the global economic crisis and the attendant stock market decline had caused "the destruction, from no default of either party, of the [total estimated balance of the GGC account of $376,000], the continued existence of which [was] essential to the performance of the contract [by both parties]." **Lane**, 994 So. 2d at 763. This "destruction" excused both parties from the performance of the contract, at least insofar as dividing the account based on

9

specific dollar amounts because "performance of the promise [had become] *vitally different* from what . . . reasonably [was] within the contemplation of *both parties* when they entered into the contract." *Id.*; *Hendrick*, 618 So. 2d at 79 (emphasis added). As of the date of divorce, it simply was impossible for both parties to receive the dollar amounts they had promised one another.

¶16. A property settlement agreement may be reformed on the basis of impossibility of performance. *Townsend*, 859 So. 2d at 376 (citing *Dilling v. Dilling*, 734 So. 2d 327, 335-36 (Miss. Ct. App. 1999). This Court noted in *Townsend* that Mississippi Code Section 93-5-2(2) provides that a judgment which incorporates a property settlement agreement "may be modified as other judgments for divorce." *Id.* at 377 (citing Miss. Code Ann. § 93-5-2(2) (Rev. 2004)). And we cited approvingly the Court of Appeals' decision in *Dilling v. Dilling*, 734 So. 2d 327 (Miss. Ct. App. 1999). In *Dilling*, the chancellor reformed the property settlement agreement, finding that it was impossible for the wife to pay the monthly mortgage payment, insurance premiums, and taxes on the marital home. *Dilling*, 734 So. 2d at 336. Thus, the Court of Appeals affirmed the chancellor's modification of the judgment of divorce, noting that it "necessarily followed from [the chancellor's] reformation of the Dillings's property settlement agreement[.]" *Id.* at 337.

¶17. In the case at bar, as of the date of divorce, the distribution of the account according to the specific dollar amounts was impossible, because the balance of the GGC account on that date was approximately $365,106. This impossibility stemmed from the incorrect estimate of the account's balance at the time of divorce, and from the fact that Kelly did not

10

have the information regarding the account to which to effect the transfer. As such, the chancellor was within her authority to utilize the equitable powers of the chancery court to "modify" or "reform" the Agreement and to order its distribution according to the applicable percentages, Melissa receiving 54% and Kelly 46%.

¶18. As this case illustrates, incorporating an estimate of an asset's value into a property settlement agreement can cause problems when the parties later try to divide the asset, and the estimate turns out to be incorrect or inaccurate. Therefore, we make the following recommendations for the benefit of the bar. Where the value of an asset must be estimated because of the inherently indefinite or fluctuating nature of the asset itself, we recommend the use of percentages when setting forth the asset's intended distribution in a property settlement agreement. Where the value of an asset remains sufficiently concrete or static, however, we recommend the use of specific dollar amounts.

**II.     Whether the chancellor erred in ordering the division of the GGC account balance as of April 1, 2009.**

¶19. The rapid decline in the account balance following the divorce makes the date of valuation of the account extremely important. By choosing the date of valuation, for equitable distribution purposes, the court decides whether any appreciation or depreciation of the asset after the cutoff date should inure to the benefit (or detriment) of one party or both parties.

¶20. We have held that, "[w]hen equitably dividing marital property upon divorce, the date of valuation is necessarily within the discretion of the chancellor." ***Hensarling v.***

11

*Hensarling*, 824 So. 2d 583, 591 (Miss. 2002) (citing *MacDonald v. MacDonald*, 698 So. 2d 1079, 1086 (Miss. 1997)). And "the chancellor's discretion in the area of equitable distribution is exceedingly broad and he 'has the flexibility to do what equity and justice requires.'" *Id.* at 590 (quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 864 (Miss. 1994)). Therefore, the chancellor enjoys broad discretion to value property as of any date that, in the chancellor's view, equity and justice may require.

¶21. We cannot say that the chancellor abused her discretion in valuing the GGC account as of April 1, 2009. The chancellor concluded that Kelly was not at fault for not transferring Melissa's share of the account as of the date of divorce because Melissa had not sufficiently proven that she had provided Kelly with the appropriate account information to effect the transfer until sometime in early 2009. Additionally, the chancellor found that it would be patently unfair for only one party to bear the loss in the account's value caused by the global economic crisis and the attendant stock market decline. The chancellor did not reach these conclusions until after the March 2009 hearing. Thus, the chancellor's decision to value the account as of April 1, 2009, was reasonable and was founded upon concerns for justice and equity. Therefore, we affirm the chancellor's application of the aforementioned percentages to the value of the GGC account as of April 1, 2009.

## CONCLUSION

¶22. We affirm the chancellor's application of the percentages for purposes of distributing the GGC account, as the Agreement was impossible to perform as of August 12, 2008, the date of divorce. We also affirm the chancellor's valuation of the GGC account, and the

application of the percentages thereto, as of April 1, 2009, because that date was reasonable and based upon the chancellor's concerns for equity and justice.

¶23. **AFFIRMED.**

**CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**