IRVING, P.J., for the Court:
¶ 1. This appeal arises out of an order by the Jones County Chancery Court granting James Samuel Powell a divorce from Sherida C. Powell on the ground of uncon-doned adultery. After finding that Sheri-da had committed uncondoned adultery, the chancery court ordered an equitable division of the marital estate. Feeling aggrieved, Sherida appeals and asserts that the chancery court’s division was not equitable.[1]
¶ 2. Finding no error, we affirm.
*497 FACTS
¶ 3. James and Sherida were wed in February 1993, in Jones County, Mississippi. No children were born to the marriage, which was neither James’s nor Sher-ida’s first marriage. James and Sherida lived together as man and wife until September 2007, when Sherida left the marital home. Sherida claimed that she left the marital home because she and James disagreed over how to run their business. Sherida testified that James told her multiple times that she should pack her “sh*t” and leave if she disagreed with him; James denied having made any such statements. James filed a complaint for divorce on September 23, 2008, wherein he alleged that he was entitled to a divorce from Sherida on the grounds of desertion, habitual cruel and inhuman treatment, and irreconcilable differences. Sherida filed an answer and counter-complaint for divorce on October 29, 2008, alleging identical grounds for divorce as those stated by James.
¶ 4. On February 12, 2009, James amended his divorce complaint to include uncondoned adultery as a ground for divorce. The chancery court entered an agreed order on March 10, 2009, allowing the amendment. In her answer to the amended complaint, Sherida admitted to having committed adultery, but she claimed that James condoned the adultery when he told her to “go on with her life.” On March 18, 2010, the chancery court granted James a divorce from Sherida on the ground of uncondoned adultery. On May 12, 2010, the chancery court issued its findings of fact and conclusions of law in support of the divorce.
¶ 5. In its findings of fact and conclusions of law, the chancery court noted that James was in poor health at the time of trial, while Sherida was in good health and was employed full time. The chancery court noted that James receives pensions in the amount of $2,929.50 each month, while Sherida’s gross income per month is $4,170. The chancery court found that James owned the marital home, a pickup truck, household furniture, appliances, a travel trailer, and $43,000 in cash at the time of the marriage, while Sherida owned a car (which James had paid for), a “few items of furniture,” personal items, and a 401 (k) retirement account from Masonite Corporation, where Sherida worked at the time of the marriage. Sherida testified that she did not know the value of her 401 (k) at the time of the marriage and that her efforts to learn its value had been unsuccessful.
¶ 6. James testified that he had completed high school and had extensive work experience as an emergency-medical technician. James indicated that he began working for the Laurel Fire Department in 1985. In 2003, James became disabled and retired from the fire department. In 1993 or 1994, James started a business, Safety on Site (SOS). Through SOS, James contracted with various companies to provide on-site fire-brigade training. James operated SOS until 1996, when he opened an ambulance-service-provider business, ASAP.[2]
¶ 7. The chancellor found that, shortly before the marriage, James borrowed approximately $59,200 to remodel the marital home. James estimated that the home was worth approximately $80,000 prior to *498 the remodeling. This value was disputed at trial by Sherida, but no other evidence was produced to value the residence. The note for the remodeling was paid during the course of the marriage, although the chancellor found that “[a]ll but one of the note payments ... were paid ... out of [James’s] income.” The chancellor also noted that James purchased a lot, titled in his and Sherida’s name, that had a value of $3,200 at the time of trial.
¶ 8. In 1996, James borrowed almost $300,000 to start ASAP. In 1997, Sherida stopped working for Masonite and went to work as ASAP’s office manager. According to Sherida, she began working for ASAP at the rate of $15 per hour, and her salary was later increased to $17.25 per hour. However, James testified that Sher-ida was supposed to be paid a monthly salary rather than by the hour. Sherida worked from the marital home. The chancellor found that James “handled all other business matters for ASAP, including hiring and replacing ambulance personnel, contract negotiations[,] scheduling!,] and other functions typically performed by the owner of a business.” Despite performing all this work for ASAP, the chancellor noted that James “received no salary or wages from ASAP except for the period of February 2002 to May 2003[,] when Sherifda] issued checks payable to [James] in the total amount of $62,798.00.... ” James testified that he did not learn about the checks until after he and Sherida had separated. Apparently, Sherida deposited the checks into a joint checking account that she and James shared.
¶ 9. The chancellor ultimately concluded that Sherida overpaid her wages while she managed ASAP, while James was not compensated for his work on the business. Furthermore, during her time as ASAP’s manager, Sherida allowed ASAP to become delinquent on its taxes; ultimately, the Internal Revenue Service froze ASAP’s bank account. ASAP repaid the delinquent taxes through an installment program, and the last of the delinquent taxes were paid out of the proceeds from ASAP’s sale. According to the chancellor’s findings, Sherida “admitted that [James] knew nothing about the payment [for delinquent taxes] but was well awai-e that the payroll taxes were not being paid.” The certified public accountant who worked for ASAP testified that James knew about the delinquent payroll taxes. Additionally, ASAP billed services to Medicaid that were not proper; Sherida admitted at trial that James did not know about the Medicaid issues until her April 2009 deposition.
¶ 10. In 2006, James sold ASAP for $490,000 dollars. The buyer paid $200,000 at closing and agreed to pay $290,000 over the next twelve years. After its sale, Sherida continued to work for ASAP. In 1996 or 1997, James rented a piece of property in Laurel, Mississippi, for ASAP to use; Sherida later purchased the land and ASAP’s trailer on it for ASAP’s benefit. Although Sherida took on the note for the Laurel property, the chancellor found that “ASAP paid for all indebtedness incurred by Sheri[da]” for the property. After ASAP’s sale, Sherida received $600 in rent each month for the property. The Laurel property was appraised and valued at $78,500.
¶ 11. The chancellor found that the $200,000 from ASAP’s sale was used to pay the following items: (1) $34,628.21 for the delinquent taxes; (2) $36,429.73 to pay a bank note that had been used to establish ASAP; (3) $83,755 for Sherida to deposit in a mutual-fund investment; and (4) $45,187.06 for James to deposit in the couple’s joint checking account. Out of the $45,187.06 that was deposited into the joint checking account, the chancery court found *499 that: (1) $4,142.55 was used to pay the remaining obligation on the Laurel property; (2) $15,000 was paid to a law firm who handled ASAP’s sale; (3) $7,500 was paid to ASAP’s purchaser to allow it to buy liability insurance; (4) Sherida was paid $13,000 for funds that she had allegedly advanced to ASAP; (5) $2,000 was used to pay ASAP’s insurance premiums; (6) $504.38 was used to pay the bank note from ASAP’s founding; (7) $190 was used to purchase gravel for the Laurel property; (8) $466.24 was used to pay for Sheri-da’s vehicle; (9) $550 was used to purchase a casket for a family pet; (10) $600 was paid to Sherida’s personal-investment account; (11) $600 was paid to Western Asset; and (12) $782.22 was paid to James when he closed the joint account in November 2007. After James and Sherida separated, James received monthly payments totaling $98,473.90 on the $290,000 promissory note owed to him by ASAP’s purchaser. In 2009, the South Mississippi Planning and Development District forgave James’s debt owed to it from ASAP’s opening. However, James incurred an income-tax liability of $32,461 as a result of the loan forgiveness.
¶ 12. After James sold ASAP, ASAP maintained its office in the marital home. ASAP paid no rent, but it contributed $250 each month for utilities. Eventually, James demanded that ASAP vacate the premises, which it did. Sherida began planning her exit from the marital home shortly thereafter. Eleven months after James sold ASAP, the business finally moved from the marital home. James estimated that it would cost him between $20,000 to $30,000 to restore his home after ASAP had left.
¶ 13. Sherida ultimately left the marital home in September 2007. Prior to leaving, Sherida rented a storage unit and applied to rent an apartment. James testified that Sherida refused to sleep in a bed with him or have sexual relations with him for “several years” prior to the separation. Sheri-da used the Internet to meet other people, including men, at least one of whom she met in person. Sherida denied that the in-person encounters resulted in sexual contact. The chancellor found that Sherida had no reason for leaving the marital home, other than her allegation that James had told her to leave. This caused the chancellor to “conclude that Sheri[da] decided to end the marriage for her own personal reasons ... which she did not reveal to the [cjourt.”
¶ 14. After separating from James, Sherida met a man named James Niss on the Internet. Unlike the other men that Sherida had met online, Sherida admitted that her relationship with Niss evolved into a sexual one. Sherida testified that she and Niss first had sex in April 2008. Eventually, in September 2008, Sherida and Niss moved in together. After moving in together, Sherida and Niss opened a joint bank account and shared household expenses.
¶ 15. After hearing all of the evidence, the chancery court concluded that the marital estate consisted of the following assets: (1) the marital home, which the chancellor valued at $123,200, $43,200 of which had accrued during the marriage; (2) the Laurel property, valued at $78,500; (3) proceeds from the sale of ASAP, which included scheduled payments of $3,265.05 per month until January 2019; (4) a MetLife account for Sherida with a balance of $61,672.29 as of December 2009; and (5) items of personal property. The chancellor did not discuss the marital debt at any length, but found that the tax liability as a result of James’s debt forgiveness was a marital debt.
¶ 16. After applying the factors found in Ferguson v. Ferguson, 639 So.2d 921 *500 (Miss.1994), the chancellor made the following equitable distribution of the marital assets: (1) Sherida retained the $88,755 that she had received from the sale of ASAP; (2) Sherida was allowed to keep the rental proceeds from the Laurel property; (3) James retained the marital home; (4) James retained the proceeds that he had already received from the sale of ASAP, plus all future proceeds from the sale; (5) Sherida was required to deed a one-half interest in the Laurel property to James, and they were to share equally in the “income and expenses associated with the property”; (6) James was responsible for the tax liability as a result of the debt forgiveness; and (7) James and Sherida each retained the personal items that each already had possession of, with the exception of any items that James had agreed to allow Sherida to remove.
¶ 17. Additional facts, as necessary, will be related during our analysis and discussion of the issue.
ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 18. The standard of review in domestic-relations cases is limited. In re Dissolution of the Marriage of Wood, 35 So.3d 507, 512 (¶ 8) (Miss.2010). As such, an appellate court “will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied.” Id. (quoting Duncan v. Duncan, 774 So.2d 418, 419 (¶ 4) (Miss.2000)). However, questions of law are reviewed de novo. Id.
¶ 19. Sherida first claims that the chancery court erred in its determination of which assets were marital and the value of those assets. In dividing a marital estate, a chancery court must determine which assets are marital and which are separate, value the assets, and then equitably divide the same. Wheat v. Wheat, 37 So.3d 632, 637 (¶14) (Miss. 2010). The Mississippi Supreme Court has defined marital assets as “any and all property acquired or accumulated during the marriage.” Id. (quoting Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994)). “[T]he chancellor’s discretion in the area of equitable distribution is exceedingly broad[,] and he ‘has the flexibility to do what equity and justice requires.’ ” Wood, 35 So.3d at 516 (¶ 20) (quoting Hensarling v. Hensarling, 824 So.2d 583, 590 (¶ 21) (Miss.2002)).
¶ 20. Sherida first attacks the value that the chancery court assigned to the marital home, which James testified was worth $80,000 before he renovated it prior to his marriage to Sherida. Sherida complains that numerous documents could have been provided to prove the value of the home. While such documents could have been provided, they were not-not by James, and not by Sherida. Sherida was entitled to provide whatever documentation she could obtain regarding the value of the home; in the absence of such, we decline to find error with the chancery court’s valuation of the home. The chancery court was entitled to rely on James’s estimation of the home’s value. Sherida also complains that the chancery court declined to find that any part of the marital home was marital property. Having reviewed the chancery court’s findings of fact and conclusions of law, we disagree with this assessment. In fact, the chancery court explicitly found that the marital home was one of the marital assets that would be equitably divided. The fact that the chancery court then concluded that James should have full possession of the home in the distribution does not change the home’s classification as marital property. We find no error with the chancery *501 court’s valuation of the home or distribution thereof.
¶ 21. Sherida next complains that the chancellor erred in “failing to calculate the value” of the future payments on the promissory note from ASAP’s sale. We note that Sherida made no effort to provide a calculation of the future value of the payments. In the absence of any valuation of the ASAP promissory note payments, we decline to hold the chancery court in error in its valuation of the payments.
¶22. Sherida also complains that James’s retirement account should have been considered a marital asset. In her brief, Sherida concedes that the only evidence as to the value of the account came from her trial exhibit 31. That exhibit was simply a summary of Sherida’s valuation of certain assets, including James’s retirement account. It appears that Sherida’s “value” for the account is simply the percentage that she believes she should receive of each of his monthly disability checks. This did not provide the chancery court with an adequate valuation of the retirement account. No other evidence was presented by either party that conclusively established the account’s value. Under these circumstances, the chancery court did not err in declining to evaluate the account as a marital asset.
¶ 23. Finally, Sherida complains that the chancery court’s distribution of the marital property was inequitable. In distributing the property, the chancery court considered the Ferguson factors and found that: (1) James had “made substantially all of the direct economic contribution to the acquisition of the marital assets”; (2) Sherida effectively ended the marriage years prior to the parties’ separation when she refused to sleep or have sexual relations with James; (3) to the extent that there was any fault in the end of the marriage, Sherida was solely responsible; (4) Sherida’s needs were being met both by her continued employment and by her relationship with Niss; (5) James’s efforts and work at ASAP had been largely uncompensated; and (6) while there were future payments from the sale of ASAP, “the ASAP note is largely unsecured[,] and if ASAP should default on payment of the note[,] the likelihood of a successful recovery of the balance due is negligible.”
¶ 24. We find no error in the chancery court’s findings and conclusions. While Sherida disputed that she had overpaid herself at ASAP and denied that James did not know about the payroll checks that she had distributed on his behalf, the chancery court was not required to find her testimony more credible than James’s. Under the circumstances of this case and applying the Ferguson factors, the chancery court did not err in its distribution. “Divorcing parties ... have no right to equal distribution even where the parties jointly accumulated the property.” Owen v. Owen, 928 So.2d 156, 164 (¶ 16) (Miss.2006) (citation omitted). While the distribution in this case may not have been equal, it appears to be equitable. An equitable distribution is all that Sherida is entitled to. As such, this contention of error is also without merit.
¶ 25. THE JUDGMENT OF THE CHANCERY COURT OF JONES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ„ CONCUR. MYERS, J., NOT PARTICIPATING.

. Sherida actually raises two separate issues: whether the chancery court erred in its classification of marital assets and whether the chancery court equitably divided said assets. We consider these two issues as a single ques *497 tion of whether the chancery court’s distribution of marital assets was equitable.

. James testified that there were two businesses called ASAP, one of which did business solely with Lamar County. The Lamar County ASAP was opened in 2000. As the parties and the chancery court generally did at trial, we have treated ASAP as one business entity.