# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00290-COA

BARRY R. ARTZ                                                           APPELLANT

v.

SHANNON C. ARTZ NORRIS                                                  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/31/2014 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | BLEWETT W. THOMAS |
| ATTORNEY FOR APPELLEE: | J. DOUGLAS FORD |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | DENIED APPELLEE'S REQUEST FOR MODIFICATION OF CHILD SUPPORT, FOUND APPELLANT IN CONTEMPT FOR FAILURE TO PAY CHILD SUPPORT AND CHILD'S MEDICAL-INSURANCE PREMIUMS, ORDERED APPELLANT TO PAY APPELLEE $5,236 FOR UNPAID CHILD SUPPORT AND $8,832 FOR UNPAID MEDICAL-INSURANCE PREMIUMS, AND AWARDED APPELLANT $11,007.19 IN ATTORNEY'S FEES |
| DISPOSITION: | AFFIRMED - 05/12/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., ROBERTS AND JAMES, JJ.**

**LEE, C.J., FOR THE COURT:**

### FACTS AND PROCEDURAL HISTORY

¶1.     Barry R. Artz and Shannon C. Artz Norris obtained a divorce in Lowndes County,

Mississippi, in 2002.  Barry was initially granted custody of the couple's minor son, Caleb,

who was born in 1994. Shannon had moved to Ohio during the course of the proceedings, and several years after the divorce became final, she filed a petition to modify custody. In 2006, the trial court granted her request, awarded Barry reasonable visitation, and ordered him to pay $181 per month in child support.

¶2. On January 16, 2007, Shannon filed a complaint for contempt and petition to modify. The parties entered into an agreed order on September 4, 2007, in which Barry agreed to pay Shannon $4,000 in back child support and reimburse her for Caleb's health-insurance premiums and one-half of Caleb's outstanding medical bills. The agreed order also provided for an increase in Barry's child-support obligation to $308 per month. Barry was given the choice to pay Shannon $192 per month for the cost of Caleb's health insurance or provide Caleb with health insurance that was substantially similar to the insurance Shannon had already obtained for Caleb, and that would be accepted by the doctors and hospitals where Caleb lived in Ohio.

¶3. The agreed order also provided for the manner in which visitation was to be exercised, and who was to pay for Caleb's airfare. Barry was to give Shannon thirty days' notice of when he would like to exercise visitation, and Shannon was to purchase a round-trip ticket. Barry was then required to reimburse Shannon for one-half of the airfare. If Barry wanted to fly Caleb to a destination other than Birmingham, Alabama, Barry agreed to book the flight, but the airfare had to be reasonable and comparable to a round-trip ticket from Louisville, Kentucky, to Birmingham, Alabama.[1]

---

[1] Barry remarried and now lives in Long Beach, Mississippi.

¶4. The agreed order also contained the following clause: "[I]n the event [Barry] fails to abide by the terms of this Order or the remaining unmodified terms of the original decree, he shall be responsible for and pay to [Shannon] all attorney's fees and costs incurred by [Shannon] since August 15, 2006."

¶5. Shannon filed a contempt action on November 14, 2012, alleging that Barry had failed to pay child support since May 2012 and that he had failed to pay Caleb's monthly medical-insurance premiums. She also sought enforcement of the order, including payment of attorney's fees for having to bring this action, and an increase in child support. Barry filed his answer and counterclaim, denying that he had violated the agreed order and seeking credit or reimbursement for Caleb's travel expenses.

¶6. Regarding his failure to pay child support, Barry testified at trial that while he had not paid child support directly to Shannon since May 2012, he had opened up a bank account in or about August 2012 for Caleb's benefit. Barry testified that he made monthly deposits into this bank account, amounts that exceeded what he was required to pay in child support, and that at the time of trial, he had deposited between $7,000 and $8,000 total. Barry testified that the account was set up in his name only, but Caleb had a signature card, which he used to make purchases. At the time of trial, Barry only had bank statements dating back to December 2012.

¶7. Regarding his failure to pay Caleb's monthly medical-insurance premiums, Barry testified that he obtained insurance for Caleb effective December 2007, and maintained that health insurance until August 2009. Shannon testified that she tried using the insurance

3

Barry obtained for Caleb, but his claims were denied. She testified that when she called to verify Caleb's insurance coverage, she could not. In July 2009, Shannon emailed Barry and informed him that she still had coverage for Caleb and that a month's supply of Amnesteem,[2] an acne medication, would only cost $10 as opposed to $488 under the insurance that Barry had obtained. When it came time for Caleb to undergo Amnesteem treatment, the parties discussed flying Caleb to Mississippi every two to four weeks to meet with the dermatologist there. After informing Barry that Caleb was still covered by the policy obtained through her husband's business, Shannon further stated in her email:

> Now, since this will help you out tremendously, I think it will be fair to have you pay for Caleb's return flights to visit the dermatologist each month. I am more than willing to take him to a lab for blood work or whatever I need to do on my end. . . . We will keep the insurance for Caleb until the [A]mnesteem is over and done with.

Shannon testified that the arrangement she and Barry discussed never occurred. Caleb did not fly back and forth to Mississippi, but met with a dermatologist in Ohio. Barry was asked on cross-examination whether Caleb ended up flying back and forth to see the dermatologist in Mississippi, to which he answered, "I don't recall." He testified that Caleb made several flights to Mississippi to see the dermatologist, and that Caleb was obtaining treatment in Mississippi until Shannon decided to seek treatment in Ohio. In one last reply email to Shannon regarding the Amnesteem treatment, Barry admitted, "I did retain insurance[;] . . . it just seems it may have sucked."

¶8.     The chancellor found Barry in contempt for failure to pay child support and Caleb's

---

[2] Amnesteem and Accutane are used interchangeably throughout the record.

monthly medical-insurance premiums, awarded Shannon a judgment against Barry for the amount of her attorney's fees and costs, but declined to increase Barry's child-support obligation. The chancellor further found that the bank account Barry opened for Caleb was not opened until after Shannon filed this action, and that Caleb withdrew approximately $200 per month from this account. Barry filed a motion to amend the judgment, which the trial court denied. Attached to this motion was an exhibit that contained bank statements dating back to September 11, 2012.

¶9. Barry now appeals, asserting that (1) the chancellor erred in finding Barry in contempt for failing to abide by the terms of the agreed order, (2) Shannon should be estopped from denying the existence of an agreement in which Shannon agreed to pay Caleb's medical-insurance premiums in exchange for Barry's payment of Caleb's travel expenses, (3) the chancellor erred in failing to credit Barry with the child-support payments paid directly to Caleb while he was attending college away from home, (4) the chancellor erred in failing to consider that Shannon's husband's corporation, and not Shannon, paid Caleb's medical-insurance premiums, and (5) the judgment against Barry for attorney's fees and costs should be reduced because Shannon was not entitled to all of the relief she was granted.

STANDARD OF REVIEW

¶10. In domestic-relations cases, we "will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong [or] clearly erroneous[,] or [applied] an erroneous legal standard[.]" *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010) (citations omitted). We review

5

questions of law de novo.  *Id.*

DISCUSSION

     I.      CONTEMPT

     II.     ESTOPPEL

¶11.    The purpose of civil contempt is to enforce a court order.  *Lahmann v. Hallmon*, 722 So. 2d 614, 620 (¶19) (Miss. 1998) (citations omitted).  "In a contempt action involving unpaid child support, when the party entitled to receive support introduces evidence that the party required to pay the support has failed so to do, a prima facie case of contempt has been made."  *Id.*  (citing *Guthrie v. Guthrie*, 537 So. 2d 886, 888 (Miss. 1989)).  To rebut a prima facie case of contempt, a defendant must show, by clear and convincing evidence, an "inability to pay, that the default was not willful, that the provision violated was ambiguous, or that performance was impossible."  *Evans v. Evans*, 75 So. 3d 1083, 1087 (¶14) (Miss. Ct. App. 2011) (citation omitted); *Lahmann*, 722 So. 2d at 620 (¶19).  "Whether a party is in contempt is left to the [c]hancellor's substantial discretion."  *Lahmann*, 722 So. 2d at 620 (¶19) (citation omitted).

¶12.    Barry argues that his failure to pay child support was not willful because he paid his monthly child-support obligation directly to Caleb by depositing money into a bank account used only by Caleb.  Barry also argues that his failure to pay $192 per month for medical insurance or otherwise provide comparable medical insurance was not willful because he and Shannon had agreed that rather than splitting the costs of Caleb's travel expenses and medical insurance, Barry would pay for Caleb's travel to and from Mississippi and Shannon

6

would pay for his medical insurance.

¶13.    The chancellor found that "[t]he parties [had] entered into a clear, unambiguous agreed order in 2007." While the chancellor commended Barry for providing support directly to Caleb, she found that he had willfully violated the terms of the order in an "attempt to rewrite the same to his own benefit, without prior [court] approval." We do not find that this was an abuse of discretion.

¶14.    "Child support is awarded to the custodial parent for the benefit and protection of the child, the underlying principle being the legal duty owed to the child for the child's maintenance and best interest." *Alexander v. Alexander*, 494 So. 2d 365, 368 (Miss. 1986) (citation omitted). Even though Caleb was attending college in Indiana, Shannon was still the custodial parent, and the agreed order requiring payment of $308 per month for Caleb's benefit was to remain in effect until Caleb's emancipation. If Barry wished to pay his support obligation directly to Caleb while he was attending college away from home, he should have petitioned the court to modify the prior decree. *See Varner v. Varner*, 588 So. 2d 428, 434 (Miss. 1991) (citing *Alexander*, 494 So. 2d at 367-68). "[A] party [who makes] an extra[]judicial modification does so at his [own] peril." *Id*.

¶15.    Regarding Barry's failure to provide medical insurance, the chancellor found Barry's explanation unpersuasive. Shannon denied that their extrajudicial agreement was ever implemented, and the emails make clear that Shannon only intended the agreement to last for the course of the Amnesteem treatment. "A chancellor's finding on conflicting evidence will not be disturbed on appeal unless it is manifestly wrong." *Strack v. Sticklin*, 959 So. 2d 1,

7

5 (¶12) (Miss. Ct. App. 2006) (citing *Milam v. Milam*, 509 So. 2d 864, 866 (Miss. 1987)). Because the chancellor's finding was not manifestly wrong, Barry's claim is without merit.

¶16.    Barry also argues that Shannon should be equitably estopped from denying that she and Barry had an agreement that she would pay for Caleb's medical insurance if Barry would cover the cost of Caleb's travel expenses. He argues that because Shannon has not reimbursed him for one-half the cost of Caleb's airline tickets, he believed the agreement to be in full force and effect.

¶17.    Equitable estoppel has been defined as "the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed." *Koval v. Koval*, 576 So. 2d 134, 137 (Miss. 1991). This Court has found equitable estoppel to be inappropriate in child-support matters. *Durr v. Durr*, 912 So. 2d 1033, 1038 (¶14) (Miss. Ct. App. 2005). "[C]hild support is for the benefit of the minor. The custodial parent is only a conduit for the support. Therefore, it follows that no action or inaction on the part of the custodial parent can relieve the defaulting parent of that parent's obligation to pay support." *Id*.

¶18.    Furthermore, we have already found that the chancellor's findings regarding this extrajudicial agreement were not in error. The emails were clear that the agreement was temporary in nature, and was only to occur during the course of Caleb's Amnesteem treatment. Barry could not have relied on this agreement when he purchased Caleb's airline tickets, and should have submitted receipts to Shannon for reimbursement. This issue also

lacks merit.

III.    CREDIT FOR CHILD-SUPPORT PAYMENTS

¶19.    Barry argues that the chancellor erred in failing to give him credit for the $7,351.99 that he deposited into the bank account used by Caleb. In *Crow v. Crow*, 622 So. 2d 1226, 1231 (Miss. 1993), the supreme court stated the rule as follows:

> [A noncustodial parent] may receive credit for having paid child support where, in fact, he paid the support directly to or for the benefit of the child, where to hold otherwise would unjustly enrich the [custodial parent]. This principle applies, however, only where the [non-custodial parent] proves by a preponderance of the evidence that he has, in fact, paid the support to the child under circumstances where the support money was used for the child for the purposes contemplated by the support order, that is, to provide shelter, food, clothing, and other necessities for the child.

*Id*. (internal citations omitted).

¶20.    The chancellor found that while Barry did not establish the bank account that Caleb used until after Shannon filed suit, she found that Caleb admitted to having access to the account, and that he withdrew approximately $200 per month. Furthermore, the chancellor commended Barry for "maintaining his relationship and support directly to Caleb," but the order is silent regarding credit to Barry for monies paid.

¶21.    Barry's bank statements for the account that Caleb used were admitted into evidence. When Barry was questioned on cross-examination regarding who made the purchases listed on the bank statements, the chancellor found that because the purchases were made in Indiana, the inference to be drawn was that the purchases were made by Caleb. The chancellor acknowledged that Barry was seeking credit for the purchases listed on the bank statements. Barry testified that Caleb exercised reasonable discretion in using the card, and

9

that he has used it for gas, to take his grandmother out to lunch, to make purchases at Walmart, and to rent a hotel room in Mississippi for him and his friends. Barry testified that he found his son's purchases of weight-gain supplements questionable and that he has talked with Caleb about being responsible with the money in the account. Shannon testified that, given "free reign on money," Caleb will purchase things he does not need. She testified that he will spend money on his girlfriend, buying her clothes, and take his friends out to eat. Shannon testified that Caleb bought his girlfriend a pet hamster. She testified that this is the reason the child support should be paid directly to her and not to Caleb, to ensure the necessities are covered first.

¶22. Based on the evidence, we cannot say the chancellor erred in not granting Barry credit for the money paid directly to Caleb. While Caleb would regularly draw from the account established by Barry for Caleb's use, Barry has failed to meet his burden of showing that the support money was used to provide food, shelter, clothing, and other necessities for Caleb. While the bank statements that were admitted into evidence show that Caleb has made purchases at Walmart and various restaurants, it is not clear for what or for whom those purchases were made. Shannon testified that Caleb takes his friends out to eat, and there is evidence in the bank statements to support that. For example, on January 7, 2013, there is a charge of $107.02 to Cracker Barrel in Richmond, Indiana. Absent a receipt or some other evidence, one can only assume that such a charge was not for the cost of Caleb's meal alone. Furthermore, many of the other charges do not appear to be for Caleb's support. For example, Caleb made several purchases at Vitamin Shoppe, and Barry testified that he did

not approve of Caleb's purchase of weight-gain supplements. If that is the case, he cannot now seek credit for the money spent on such. Since Barry failed to show how the money he paid Caleb was used for his support, this issue is without merit.

IV. UNJUST ENRICHMENT

¶23. Barry argues that Shannon is not entitled to $8,832 for unpaid medical-insurance premiums because Shannon did not pay for Caleb's medical insurance; her husband's corporation did. This argument is without merit. The 2007 agreed order requiring payment of $192 per month for the cost of Caleb's medical insurance states in pertinent part:

> Should [Barry] be able to secure and pay for health insurance for the minor child that is substantially similar in benefits and deductibles to that insurance now being provided by [Shannon] for the minor child and which will be accepted by all physicians and hospitals where the minor child resides with [Shannon], [Barry] may procure and pay for same and thereby discontinue paying to [Shannon] the cost of *health insurance being provided by [Shannon] through her husband's business*.

(Emphasis added). Barry knew when he entered into the agreed order that Caleb's medical insurance was being provided by Shannon's husband's corporation. He cannot now object to what he ultimately agreed to. If Barry did not want to pay Shannon $192 per month for the cost of Caleb's medical-insurance premiums, he could have obtained medical insurance for Caleb that was substantially similar to the medical insurance obtained by Shannon for Caleb's benefit. He failed to do so.

V. ATTORNEY'S FEES

¶24. Barry argues that because Shannon is not entitled to all the relief she was granted, the amount of attorney's fees awarded should be reduced. "In a civil contempt proceeding, the

11

trial court has discretion to award reasonable attorney['s] fees to make the plaintiff whole and to reinforce compliance with the judicial decree." *Hinds Cnty. Bd. of Supervisors v. Common Cause of Miss.*, 551 So. 2d 107, 125 (Miss. 1989). "Where a party's intentional misconduct causes the opposing party to expend time and money needlessly, then attorney['s] fees and expenses should be awarded to the wronged party." *Mabus v. Mabus*, 910 So. 2d 486, 489 (¶8) (Miss. 2005) (citation omitted). Because Barry was found to be in contempt, it was not error for the chancellor to award Shannon attorney's fees. Furthermore, the agreed order provided for an award of attorney's fees if Barry failed to abide by its terms. This issue is therefore without merit.

¶25. **THE JUDGMENT OF THE LOWNDES COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. BARNES, J., NOT PARTICIPATING.**